# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**PETER J. RUSTHOVEN**
**JOHN R. MALEY**
Barnes & Thornburg, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**JAY P. LEFKOWITZ**
**STEVEN J. MENASHI**
Kirkland & Ellis, LLP
New York, New York

**STEVEN D. McCORMICK**
**DOUGLAS G. SMITH**
Kirkland & Ellis, LLP
Chicago, Illinois

**ANDREW W. HULL**
**DANIEL K. BURKE**
Hoover Hull, LLP
Indianapolis, Indiana



FILED
Feb 13 2014, 12:40 pm
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| STATE OF INDIANA, acting on behalf of the Indiana Family & Social Services Administration, | ) ) ) ) | |
| Appellant-Defendant, | ) ) | |
| vs. | ) ) | No. 49A02-1211-PL-875 |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) ) | |
| Appellee-Plaintiff. | ) ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable David J. Dreyer, Judge
Cause No. 49D10-1005-PL-21451

**February 13, 2014**

**VAIDIK, Chief Judge**

## Case Summary

Indiana's poorest residents live hand-to-mouth trusting that they will receive food stamps to eat and Medicare or other state health insurance in order to receive basic medical care. These citizens do not have the luxury of being able to wait to eat or go to a doctor while a phone goes unanswered, an appointment cannot be scheduled, or an application sits on a desk. The needs of the poor are immediate.

Indiana entered into an arrangement with the federal government to distribute federal funds to those in greatest need. Part of the State's responsibility was to make certain that only the poorest received aid and to help welfare recipients find work. If the State failed to comply with federal guidelines, then it would be penalized by the federal government, resulting in less federal aid for our citizens.

By all accounts, the State was failing in performing its duties. As a result, in December 2006, the State, on behalf of its agency the Indiana Family and Social Services Administration (FSSA),[1] entered into a ten-year, $1.3 billion contract with International Business Machines Corporation (IBM) to modernize and improve the State's welfare system. IBM agreed to the State's proposal, although it argues that the system design was doomed to fail. Nonetheless, IBM received $437 million while assuring the State that it

---

[1] The FSSA—the State's largest agency—is charged with, among other things, administering Medicaid, Food Stamp, and Temporary Assistance to Needy Families (TANF) programs for the State of Indiana. Each of these programs provides welfare benefits to individuals and families in need of financial assistance in Indiana. To be deemed eligible for a particular program, an individual must be certified as eligible by the FSSA and recertified either annually or semi-annually depending on the particular program. *See Perdue v. Gargano*, 964 N.E.2d 825, 830 (Ind. 2012).

2

was up to the task. Less than three years into the ten-year contract, the State terminated the contract citing IBM performance issues, and the parties sued each other for breach of contract on the same day in Marion Superior Court. The State sought over $170 million in damages, and IBM sought almost $100 million. Appellant's App. p. 239-40. The trial court granted IBM summary judgment for $40 million in assignment fees and, after a six-week bench trial in 2012, found no material breach on IBM's part and awarded IBM an additional $9,510,795 in Equipment fees, $2,570,621 in Early Termination Close Out Payments, and $10,632,333 in prejudgment interest, totaling $62,713,749.

While IBM's software, computers, and employee training aided in delivering welfare services, the primary focus of the contract was to provide food and medical care to our poorest citizens in a timely, efficient, and reliable manner within federal guidelines, to discourage fraud, and to increase work-participation rates. In the most basic aspect of this contract—providing timely services to the poor—IBM failed. We therefore reverse the trial court's finding that there was no material breach.

Despite finding a material breach on IBM's part, we affirm the trial court's award of $40 million in assignment fees and $9,510,795 in Equipment fees to IBM. We do so because the State and IBM agreed under the terms of the contract that the State would pay these fees. Further, the State would be unjustly enriched if it were to keep IBM's equipment and to assume IBM's subcontracts without paying IBM. We further affirm the trial court's denial of Deferred Fees to IBM, reverse the trial court's award of $2,570,621 in Early Termination Close Out Payments and $10,632,333 in prejudgment interest to IBM, and remand the case to the trial court to determine the amount of fees IBM is entitled to for

3

Change Orders 119 and 133. Finally, we remand the case to the trial court to determine the State's damages for IBM's material breach of the contract and to offset any damages awarded to IBM. We therefore affirm in part, reverse in part, and remand the case to the trial court.

**Facts and Procedural History**

The facts in this case are largely undisputed.[2] During Governor Mitch Daniels's first term as governor, he declared Indiana's welfare system "broken." Appellant's App. p. 166. It was "plagued by high error rates, fraud, wasted dollars, poor conditions for its employees, and very poor service to its clients." *Id.* Indiana's welfare-to-work record was the worst in the country. *Id.* at 167. Consequently, Governor Daniels dubbed Indiana's welfare system "America's worst welfare system." Press Release, Governor accepts recommendation to modernize FSSA eligibility processes (Nov. 29, 2006), http://goo.gl/Tfbas4 (Ex. 612).

---

[2] The State does not set forth any background facts in its brief. *See* Appellant's Br. p. 4-14. IBM sets forth some background facts, but its citations for these facts are to the trial court's nearly thirty-five pages of findings of facts—not to the official transcript. Because no party challenges the findings of facts, we use the trial court's findings when setting forth the background facts of this case.

In addition, we note that our review of this case has been hampered by the trial court's citations to the uncertified, and thus unofficial, transcript of this case. *See* Appellant's App. p. 166 n.3 (trial court explaining in its July 2012 order that "[c]itations to trial testimony are taken from the uncertified transcript and are unofficial."). The record shows that in advance of trial, both "parties collaboratively arranged for a team of John Connor & Associates certified court reporters to prepare daily trial transcripts for each day of trial and throughout the trial and those transcripts have been paid for by the parties." *State v. Int'l Bus. Machs. Corp.*, Cause No. 49A02-1211-PL-875, Agreed Mot. Regarding Submission of R. Items for Purposes of Appeal (filed Jan. 3, 2013). In the meantime, "the Marion Superior Court, Civil Division 10, court reporters . . . prepared the 'official' trial transcript," resulting in discrepancies between the two records. *Id.* Because the parties and trial court cited the unofficial transcript in the trial court, they asked this Court if they could use the unofficial transcript for purposes of appeal because "citing to the newly generated and re-paginated 'official' trial transcripts will be laborious for the parties and confusing for all concerned, including this Court." *Id.* However, an order from our former Chief Judge denied the parties' request to cite the unofficial trial transcript prepared by private court reporter John Connor & Associates because it did not comport with Indiana Appellate Rules 28, 29, and 30. *State v. Int'l Bus. Machs. Corp.*, Cause No. 49A02-1211-PL-875 (Ind. Ct. App. Jan. 18, 2013).

Shortly after Governor Daniels was elected in November 2004, he and senior officials—including former Indianapolis Mayor Stephen Goldsmith and FSSA Secretary Mitch Roob—set out to modernize and improve Indiana's welfare system. The new system was modeled after the system in Texas. Under the new model, Indiana citizens would apply for benefits "via web and call center" without the need for a face-to-face meeting with a case worker, and eligibility determinations would be made on a centralized, statewide basis rather than in the local county welfare offices. Appellant's App. p. 167. One of the State's requirements for the new system was to "reduce the number of mandatory visits to local offices" by "giving clients more avenues to interact with the agency," such as "the Internet, an automated and interactive phone system, and local organizations in the community." *Id.* at 168. Analysts had found that citizens most in need of FSSA's help were forced to make more than two million unnecessary trips a year. *Id.*

In October 2005, FSSA began seeking vendors for the project. *Id.* at 169. IBM and a group of twelve coalition companies, including Dallas, Texas-based ACS Human Services, submitted a bid. In May 2006, the State announced its intention to award the contract to the IBM Coalition.[3]

After months of negotiations, on December 27, 2006, the State of Indiana and IBM signed a ten-year, $1.3 billion Master Services Agreement ("MSA"). Specifically, the MSA sought to "transform and modernize the process by which information needed or related to making eligibility determinations is collected, organized, and managed . . . in

---

[3] Other participating bidders dropped out, leaving the IBM Coalition as the only potential contract partner. Appellant's App. p. 169-70. The largest portion of the work among Coalition members went to ACS. *Id.* at 169.

5

order to improve access to, and responsiveness of, that system and process, and to assure the integrity, reliability and efficiency of the public assistance contemplated by such programs[.]" *Id.* at 566. During the process of negotiating and drafting the agreement, the State was represented by outside counsel as well as the Office of the Attorney General, which reviewed the contract as it was being drafted and approved it for "form and legality." *Id.* at 172. Governor Daniels signed the MSA for the State. *Id.* The MSA contains more than 160 pages plus extensive attachments, including 10 exhibits, 24 schedules, and 10 appendices. *Id.*

As part consideration for the MSA, a Memorandum of Understanding ("MOU") was also signed on the same day as the MSA. According to the MOU—which was executed by IBM, the Indiana Economic Development Corporation, Purdue University, and Indiana University—IBM agreed to undertake collaborative activities designed to promote economic activity in the state, including creating 1000 full-time new jobs. Ex. 1709.

The MSA incorporated the various goals that were important to the State in deciding to overhaul Indiana's welfare system. MSA § 1.1(1) identified the following "Policy Objectives":

> (1) The overarching policy objectives of the Modernization Project and this Agreement are (i) to provide efficient, accurate and timely eligibility determinations for individuals and families who qualify for public assistance, (ii) to improve the availability, quality and reliability of the services being provided to Clients[4] by expanding access to such services, decreasing inconvenience and improving response times, among other improvements, (iii) to assist and support Clients through programs that foster personal

---

[4] "Client" means "any individual or family (1) who receives or applies for assistance under a Public Assistance Program during the Term, or (ii) whose Records or Personal Information have been delivered to Vendor pursuant to the Agreement for receipt of benefits under a Program." Appellant's App. p. 761.

6

responsibility, independence and social and economic self-sufficiency, (iv) to assure compliance with all relevant Laws, (v) to assure the protection and integrity of Personal Information gathered in connection with eligibility determination, and (vi) to foster the development of policies and procedures that underscore the importance of accuracy in eligibility determinations, caseload integrity across all areas of public assistance and work and work-related experience for Clients in the Programs.

\* \* \* \* \*

(5) Vendor recognizes that (i) the Services to be performed under this Agreement are vital to the State and its citizens who currently are and in the future will be legally eligible for and reliant upon the assistance available under the Programs and must be continued without interruption and (ii) upon Termination, a Successor must be able to continue to provide the Services in as seamless a transition from Vendor as possible.

Appellant's App. p. 567. In addition, MSA § 1.4, entitled Construction and Interpretation, provided that the agreement "shall be" construed in a manner consistent with the Policy Objectives:

(5) In the event of any uncertainties regarding the interpretation of any particular provision or term used in this Agreement, or in the event of any ambiguity, vagueness or inconsistency therein or thereof, such provisions and terms shall be read in a manner consistent with the Policy Objectives. In all events, the provisions and terms of this Agreement shall be interpreted with a view toward achieving those objectives. Notwithstanding the foregoing, in no event shall the Policy Objectives change or expand Vendor's obligations hereunder unless expressly agreed to by the Parties pursuant to a Change.

*Id.* at 571.

Under the terms of the MSA, IBM would assist the State in processing the applications for public assistance under the State's existing procedures in all ninety-two Indiana counties. The new system would then be rolled out in phases on a region-by-region basis according to a "preliminary" "Initial Transition Timeline." *Id.* at 175 (citing MSA § 3.2.1(2)). The final stage of the process, or "Steady State," would be reached when the

7

new system was rolled out to all ninety-two counties. *Id.* (citing MSA § 3.2.1(1) & Appendix I). As it would turn out, Steady State was never reached because the State terminated the MSA and moved to a hybrid system when only about half of Indiana's counties were operating under the modernized system.

In any event, according to the MSA, the State retained operational control throughout the project, including "general authority and responsibility for operational, technical, financial, and general management and oversight of the Services provided under the Agreement." *Id.* (citing MSA App. V, § 3.7.2). The State also retained all policy-making authority over the project. *Id.* at 175-76 (citing MSA § 3.1.1(6)). Finally, the State made final eligibility determinations for the public-assistance programs. *Id.* at 176 (citing MSA § 3.1.1(1)).

In order to assess IBM's performance, the parties agreed on four categories of "Performance Standards":

> (1) Critical Transition Milestones, which were penalties imposed if IBM did not achieve the milestones identified by the State that were critical to the successful transition of the Services;
> (2) Transition Key Performance Indicators, which were performance measurements for the "as-is" counties during the transition;
> (3) Key Performance Indicators, which were performance measurements for the modernized system in force originally only during Steady State; and
> (4) Service Level Metrics, which related primarily to service levels that guided the priorities of IBM, also in force only during Steady State.

*Id.* at 178-79, 737, 738. These were attached to the MSA in Schedule 10. *See id.* at 735. Twenty Key Performance Indicators were designed to measure performance only during Steady State. *See id.* at 744-48. However, eleven of the Key Performance Indicators were accelerated by agreement of the parties in Change Order 64 and began on September 1,

8

2008. *Id.* at 179-81 (citing Ex. 1500.064). Many significant metrics, such as the Service

Level Metrics, did not apply until Steady State, which was never reached.

All of these standards included liquidated-damages provisions. They ranged from

$150,000 to $350,000 for Critical Transition Milestones and far smaller sums—$500 to

$5000—for the Key Performance Indicators and others. *See, e.g.*, *id.* at 744-48.

Under Article 16 of the MSA, the State could terminate the agreement (1) for

convenience or (2) for cause. *Id.* (citing MSA §§ 16.3.1, 16.3.2). The termination-for-

cause section provided that the State could terminate the agreement in three ways:

> (1) The State may terminate this Agreement, in whole or in part, for cause in any of the following circumstances:
>
> > (A) a breach by Vendor[5] of this Agreement which is material considering this Agreement as a whole occurs which cannot reasonably be cured by Vendor within thirty (30) days after delivery of the Termination Notice (the "Notice Period");
> >
> > (B) a breach by Vendor of this Agreement which is material considering this Agreement as a whole occurs which can reasonably be cured by Vendor within the Notice Period but which has not been cured within the Notice Period unless Vendor (i) has submitted to the State within the Notice Period a Corrective Action Plan to cure the breach within sixty (60) days after the date Vendor receives notice of the breach from the State (the "Extended Cure Period"), (ii) proceeds diligently according to such Plan, and (iii) cures the breach within the Extended Cure Period (in which case the State's termination shall become effective when Vendor fails to perform any one of steps (i), (ii), or (iii)); or
> >
> > (C) a series of breaches of Vendor's obligations, none of which individually, constitutes a breach of this Agreement which is material considering this Agreement as a whole, but which, in view of Vendor's history of breaches, whether or not cured, collectively constitute a breach of this Agreement which is material when considering this Agreement as a whole, provided that the State's

---

[5] According to the MSA, "Vendor" is defined as IBM. Appellant's App. p. 782, 566.

9

notice to Vendor shall be provided within a maximum of three (3) months after the last such breach upon which the State bases its termination. For the purposes of clarity, the cure periods set forth in Sections 16.3.1(1)(A) and 16.3.1(1)(B), as appropriate, shall apply to a notice given under this Section 16.3.1(1)(C) as to any breach for which a cure period has not previously been provided.

*Id.* at 692-93 (MSA § 16.3.1(1)). Under the termination-for-convenience provision, the State could terminate the agreement, in whole or in part, "for any reason" that the State determined was "in its best interest." *Id.* at 693 (MSA § 16.3.2).

The MSA included a range of payment provisions in the event that the agreement was terminated. Some of these, however, depended on whether the contract was terminated for convenience or for cause. In Article 14 governing Subcontractors, Section 14.8.1(3) gave the State the option of assuming IBM's subcontracts but provided for subcontractor assignment fees in certain circumstances:

(3) In the event the State exercises its right to accept assignment of one or more Subcontracts pursuant to this Section 14.8, the State shall not be required to pay to Vendor the Early Termination Close Out Payments that are directly attributable to the performance of such assigned Subcontract(s), but, instead for each Subcontract assigned to the State, the State shall pay Vendor the following upon the applicable Services Termination Date:

(A) if the replaced Subcontractor is ACS, (i) the amount of the Deferred Fees for Vendor's Subcontract with ACS as set forth in Schedule 24 [Deferred Fees], plus (ii) Ten Million Dollars ($10,000,000), if the applicable Services Termination Date is within Contract Years one through seven . . . .; and

(B) for each assigned Subcontract with a Key Subcontractor (other than ACS) and each other assigned Primary Subcontract (other than those Subcontracts with an aggregate contract value of less than Five Million Dollars ($5,000,000)), Five Million Dollars ($5,000,000), if the applicable Services Termination Date is within Contract Years one through seven . . . .

10

provided, however, that the provisions of this Section 14.8.1(3) shall not apply if all the Services contained within an applicable Subcontract are terminated by the State pursuant to Sections 16.3.1 [termination for cause], 16.3.4(2) [insolvency events], or 16.3.4.(3) [wrongful conduct], except that the unamortized balance of the Deferred Fees shall still be payable in such event.

*Id.* at 681. Similarly, Section 16.6.1(4) provided that the Disengagement Plan "shall" detail the transfer of Equipment and that "[u]pon receipt of payment for" the Equipment, IBM "shall provide the Successor with an agreed upon bill of sale . . . ." *Id.* at 700. Section 16.6.6 required the State to pay IBM Early Termination Close Out Payments, including Deferred Fees, in the event that the MSA was terminated. *Id.* at 702. However, as the trial court later determined on summary judgment, IBM was not entitled to Deferred Fees if the State terminated the MSA for cause. *Id.* at 383-87 (trial court's January 25, 2012 order).

"Phase 1" of the rollout began in March 2007. It consisted of informing the public as well as recruiting and transferring about 1500 State employees to IBM subcontractors. *Id.* at 183. "Phase 2" occurred over a seven-month period from October 2007 to May 2008 as the parties rolled out the modernized system in three stages. *Id.* On October 25, 2007, the State approved the rollout of the project to a twelve-county pilot area in north-central Indiana. *Id.* During this pilot phase, the State's Modernization Project team evaluated the IBM Coalition's performance, including the readiness of the Service Centers, document-processing center, general infrastructure, and application processing. *Id.* The team, including Secretary Roob, regularly met with the IBM team during the Pilot Phase and throughout the Modernization Project. *Id.* The parties "saw implementation issues immediately," including unanswered calls and the untimely processing of applications. *Id.*;

11

*see also id.* (June 2007 email from Secretary Roob to IBM Vice President of State and Local Government Brian Whitfield: "tens of thousands of calls unanswered, honestly perhaps the worst performance I have ever seen in a call center." (citing Ex. 8021)).

The trial court found that two background factors contributed to these initial difficulties. First, by December 2007, which was two months after rollout of the pilot region, the State and the country began to feel the effects of the "Great Recession."[6] *Id.* at 185. Benefit applications skyrocketed, and over the next two years, the State's unemployment rate more than doubled. *Id.* at 185-86.

Second, in 2008, Indiana was hit by a series of natural disasters that cost the State nearly $2 billion in economic damage. *Id.* at 186. All but ten of Indiana's counties were declared Presidential Disaster Areas. *Id.* at 186-87. These disasters affected the rollout of the project, which was eventually suspended by mutual agreement of the parties in September 2008 in Change Order 69 in order to accommodate disaster-relief efforts. *Id.* at 188. The State directed the reassignment of approximately one-third of the State and IBM Coalition workforce to help process tens of thousands of emergency food-stamp applications and thousands of FEMA applications. *Id.* at 187.

Despite these challenges, in March 2008, the IBM Coalition received the State's approval to begin providing modernized services to Region 2A, which represented twenty-seven counties in southern and central Indiana. *Id.* After two months of operating these counties under the modernized system, on May 5 the State gave its approval to rollout the project to Region 2B, which represented twenty counties divided between southwest and

---

[6] The trial court cited a document from the National Bureau of Economic Research for the proposition that the recession began in December 2007. *See* Appellant's App. p. 185 n.30.

northeast Indiana. *Id.* In total, the modernized system was implemented in fifty-nine of Indiana's ninety-two counties.

During the rollout, the State conducted a series of project assessments. In May 2008, FSSA Secretary Roob reported to the Indiana General Assembly that although they "still ha[d] more work to do," modernization had allowed the State to serve "more people statewide and in a timelier manner than we ever have before." *Id.* at 189; Ex. 34. In August 2008, FSSA reported to federal authorities that although the start and finish dates of several key milestones had to be adjusted, the Modernization Project had "'already made substantial progress toward its goals and objectives.'" Appellant's App. p. 189 (quoting Ex. 247, a document requesting Federal Financial Participation for the costs projected during FY2009). In October 2008, the director of the FSSA's Division of Family Resources gave IBM primarily 9s and 10s (out of a possible 10) in IBM's annual customer satisfaction survey. *Id.* (citing Ex. 208). And in a December 2008 interview, which was nine months before the State terminated the MSA, Governor Daniels said that the new system was "a work in progress" and "far from perfect" but "far better than what preceded it," noting that critics wanted to "go back to a system where you had to beg for an appointment face to face," which was "atrocious." *Id.*; Ex. 630.

The State expanded the scope of IBM's work numerous times during the course of the project, which added $178 million to the contract price. Appellant's App. p. 190. These expansions were reflected in Change Orders 23, 33, 53, 60, 64, 67, 68, 90, 93, 119, and

133.[7] *Id.* at 190-91. For example, the State significantly increased the scope of the project in 2007 with Change Order 23 in order to include the Healthy Indiana Plan (HIP), which provides health insurance to uninsured Indiana residents who fall below a certain income level. *Id.* at 184. When the HIP launched, the number of applications regularly exceeded the State's predictions, which caused IBM to fall behind on application processing, thereby placing additional strain on the modernized system. *Id.* at 184-85.

But, as even the trial court found, these accolades and expansions did not mean that the project did not have problems. *Id.* at 191 (Finding No. 53). In November 2008, the IBM Coalition met with Secretary Roob to propose changes to the project because of problems including inconsistent feedback, document acceptance and processing, case-processing timeliness, quality, and higher volumes. Ex. 65, p. 12. Secretary Roob approved many of IBM's proposed reforms. Appellant's App. p. 191. Shortly after Secretary Roob approved the IBM Coalition's proposed reforms, Governor Daniels appointed Roob as Indiana's Secretary of Commerce and CEO of the Indiana Economic Development Corporation; Anne Murphy replaced Roob as FSSA Secretary. *Id.*

In March 2009, Secretary Murphy sent the IBM Coalition a letter drafted by the State's outside counsel requesting a Corrective Action Plan. *Id.*; Ex. 75 ("The State of Indiana has raised with IBM multiple issues with the Modernization Project that need to be addressed immediately and believes that it is in the best interest of the State and IBM to enter into a Corrective Action Plan as contemplated by Section 15.4.1 of the [MSA].").

---

[7] In addition, there is an issue on appeal as to whether IBM admitted Change Orders 71 and 102 into evidence. This issue is addressed in IBM's cross-appeal, which challenges the trial court's failure to award IBM fees for four change orders, including Change Orders 71 and 102.

The letter identified thirty-six "issues" that the State wanted the IBM Coalition to address, including excessive wait times at local offices, incorrectly categorized imaged documents, high turnover of staff, scheduling problems, inaccurate and incomplete data gathering, clients not receiving mailed correspondence, poor communication to all staff, unresolved help-desk tickets, untimely expedited food-stamp processing, excessive wait times for applicant appointments, and failure to process Food Stamp, TANF, and Medicaid applications in a timely manner. Ex. 75. The IBM Coalition responded to the State's letter and denied that a formal Corrective Action Plan was required under the MSA; nonetheless, it expressed a willingness to work with the State to address the issues. Appellant's App. p. 192. The IBM Coalition also argued that twenty-one of the thirty-six issues did not relate to any contractual measure or performance standard contained in the MSA while six of them related to performance standards that were not yet in effect. *Id.* While the State found "some" of IBM's responses helpful, it found many of them to be "incomplete, non-responsive, insufficient or otherwise unsatisfactory." Ex. 1929. This implied to the State that:

> IBM has not fully appreciated the depth of the State's concerns about the status of the Modernization Project and the Coalition's failure to achieve expected performance objectives in the modernized regions, ongoing failures in the As-Is regions and failure to make satisfactory progress on the overall implementation of the Modernization Project. These concerns have been expressed as well by many key constituencies, including State legislators, federal agencies, client advocates and other stakeholders.

*Id.*

On July 2, 2009, the parties agreed on a Corrective Action Plan to address the issues that had been raised by the State's March 2009 letter as well as an independent analysis

15

undertaken by IBM. The Corrective Action Plan included twenty-two short-term "Quick Wins" and thirty-one long-term initiatives. Appellant's App. at 192 (citing Ex. 5409).

But in late July 2009, the federal agency overseeing Medicaid programs—Centers for Medicare and Medicaid Services (CMS)—found that Indiana was "consistently not meeting Federal eligibility processing requirements." *Id.* at 834. CMS noted that since the Modernization Project's rollout, it was "plagued" "by ongoing issues and complaints that consumers are losing Medicaid benefits or being denied benefits inappropriately." *Id.* The problems included extended wait times for processing enrollment applications and in receiving responses to Call Center inquiries, lack of responses to enrollment applications, and inappropriate disenrollments. *Id.* CMS noted that these problems, which had garnered media attention, "indicate a serious situation in Indiana that is negatively impacting consumers' access to Medicaid." *Id.* at 834, 837. Finding that the State was not in compliance with several provisions of the United States Code and the Code of Federal Regulations, CMS ordered the State to provide its own "Corrective Action Plan (CAP) for ensuring that the Federal eligibility requirements are met." *Id.* at 837.

The trial court found that by mid-October 2009, the IBM Coalition had made "substantial progress" on the Corrective Action Plan entered into between the State and IBM. *Id.* at 193. As support for this finding, the trial court relied on statements made by an attorney general in a September 2009 hearing in *Thornton v. Anne Murphy* in the United States District Court for the Southern District of Indiana. *Id.* The litigation concerned how long it took the State to process applications. The attorney general, speaking for the defendant, stated:

16

We looked at what were the causes. We tried to identify the causes; and we've initiated a number of activities to correct those causes, many of which—they call it Quick Win[s], but we have made substantial progress in a very short period of time.

Ex. 304, p. 70. The trial court also cited a late September 2009 email which contained public statements from Secretary Murphy that "a team of vendors led by IBM Corp. has already made improvements in technology and added more staff under a corrective action plan submitted in July"; however, Secretary Murphy added that "the timeliness of processing applications for food stamps, Medicaid and other benefits has not improved."[8] Ex. 111.

Nevertheless, in September 2009, two months after the State and IBM signed the Corrective Action Plan, the State decided to change course and adopt a hybrid approach to welfare modernization, which the State and IBM referred to as "Plan B." *Id.* at 194. Most notably, Plan B abandoned the centralized Call Center, moving the eligibility determinations to the local office where clients would experience face-to-face interactions with FSSA staff handling their cases. *Id.* at 194-95 (citing Ex. 2085). The State noted that "'[t]he largest difference between the Hybrid System and the modernized system will be

---

[8] To support its finding that the IBM Coalition had made substantial progress, the trial court also cited an email that contained a June 29, 2009 newspaper article in the Evansville Courier & Press quoting Governor Daniels. Two Evansville lawmakers—a State senator and representative—said that their constituents had repeatedly complained of long waits on hold with the new call center, lost documents in the online system, and lines at local agency offices. Ex. 1105. Although Governor Daniels was quoted as saying that the "backlogs are coming way down. Complaints are dropping," he was also quoted as saying that he was "very dissatisfied with at least certain aspects" of the Modernization Project, which led to "one very direct conversation with IBM and their partners." *Id.* Governor Daniels said that as a result, the "contractors understand they have a responsibility to make the new system work without all the glitches." *Id.* Notably, the article said, "Data showing improvement is not available now." *Id.* The article also previewed the Corrective Action Plan that the parties ultimately signed on July 2, 2009, which included hiring hundreds of workers, retraining workers, and reviewing documents more quickly—all at the IBM Coalition's expense. *Id.*

17

an increased focus on the face-to-face contact.'" *Id.* at 195 (quoting Ex. 97). The State approached IBM about implementing the hybrid plan, but an agreement was never reached between the parties because the State could not afford the price that IBM was charging for the plan. *Id.* at 196-98. Even after the parties failed to agree on an IBM-led rollout of the hybrid plan, the State encouraged IBM to continue as the technology vendor. *Id.* at 198.

On October 15, 2009—less than three years into the ten-year contract—Secretary Murphy delivered a letter to IBM explaining that the State was terminating the MSA "in whole" "for cause" effective December 14, 2009. Ex. 1555. The State alleged that IBM's breaches included "numerous and repeated quality and timeliness failures." *Id.* In addition, the State alleged that pursuant to Section 16.3.1(1)(A) of the MSA, IBM's breaches were material considering the MSA as a whole and IBM could not reasonably cure them within thirty days of the notice. *Id.* The State also alleged that pursuant to Section 16.3.1(1)(B) of the MSA, some—but not all—of IBM's breaches were the subject of IBM's July 2009 Corrective Action Plan, but IBM had not proceeded diligently according to the Corrective Action Plan. *Id.* Finally, the State alleged that pursuant to Section 16.3.1(1)(C) of the MSA, IBM's series of breaches, in view of IBM's history of breaches, collectively constituted a breach of the MSA, which was material considering the MSA as a whole, with the last of such breaches occurring within three months of the notice of termination. *Id.*

On the same day as the termination letter, Governor Daniels held a press conference to announce the termination of the MSA and the State's plan for a "hybrid" system. Ex. 52. According to the press release, the hybrid system would "incorporate successful

18

elements of the old welfare delivery system and what is known as the modernized system" and "include more face-to-face contact and more localized team-based case management." Press Release, State ends contract with IBM for welfare services (Oct. 15, 2009), http://goo.gl/4d63PF. Also according to the press release, the State canceled the contract with IBM because IBM "did not make satisfactory progress to improve services to welfare applicants and recipients under a plan to correct deficiencies." *Id.* The press release continued:

> "The fraud appears to have been stopped and we're still on track to save taxpayers hundreds of millions of dollars, but the intended service improvements have not been delivered, and that's not acceptable," said Daniels. "Those who raised concerns about service quality were correct and we appreciate their efforts. We'll now take the best parts of the old and new and move ahead with a hybrid system in what amounts to a major mid-course correction."

*Id.* The press release stated that the IBM system suffered from two fundamental flaws in concept: (1) the system tried to remove the burden of required face-to-face meetings and (2) it used a task-based approach rather than a case-based approach to process applications. *Id.*

In total, the State paid IBM approximately $437 million under the MSA. Appellant's Br. p. 2; *see also* Appellee's Br. p. 8 ("The State continued to make payments to IBM and its subcontractors each month without objection, including more than $428 million over 36 months." (citing Appellee's App. p. 247)).

After the State notified IBM of the termination of the MSA, the State and IBM entered into a Disengagement Plan on December 11, 2009.[9] *See* Appellant's App. p. 869; Ex. 472. The Disengagement Plan set forth the activities of the State and the Disengagement Services to be provided by IBM as required by the State in connection with its termination of the MSA. Ex. 472, p. 1. Under the Disengagement Plan, the State was required to pay IBM $4,412,200 for Disengagement Services. Ex. 472, p. 36. IBM does not dispute that the State has paid it $4.4 million for such services. Tr. p. 6739-40. Under the section of the Disengagement Plan called "Schedule A—Transfer of Dedicated Equipment," the State was to specify the equipment that it wished to be transferred to it. IBM invoiced the State $9,349,654.93 for the computers and furniture that it kept. Appellant's App. p. 889. The State, however, never paid this invoice.

On May 13, 2010, the State filed a complaint for damages and declaratory relief against IBM in Marion Superior Court seeking over $170 million. The State alleged that IBM materially breached the MSA as follows:

---

[9] The parties contemplated such a plan in the MSA in the event that the contract was terminated. MSA § 16.6.1 provided:

> Vendor acknowledges that, upon Termination of this Agreement or Services for any reason, in whole or in part, either the State or another service provider (either, a "Successor") may provide services similar to the Services and the Delegated Activities (or such portion thereof related to the portion of this Agreement and the Services so terminated). In such event, Vendor shall furnish adequate and appropriate phase-out services ("Disengagement Services") pursuant to a Disengagement Plan ("Disengagement Plan"), which plan shall be executed prior to the Services Termination Date, with Disengagement Services commencing upon the direction of the State and continuing for up to six (6) months after this Agreement terminates or such longer period as the State may reasonably require (up to a maximum of an additional six (6) months) ("Disengagement Period"). The Disengagement Plan shall include the following assistance upon the State's request . . . .

Appellant's App. p. 699.

157. IBM failed to roll out the Modernized system to the entire State by the agreed date, implementing the Modernized service in just 59 of Indiana's 92 counties.

158. IBM failed to achieve its promise of improving timeliness, accuracy, and client satisfaction and failed to meet established performance measures.

159. In the counties where IBM rolled out the Modernized system, performance standards fell significantly below the non-Modernized counties, fell below the counties' performance prior to the roll-out, and was below Federal and State guidelines.

160. The State provided IBM the opportunity to cure its defective performance through the [Corrective Action Plan]; however, IBM failed to satisfy the requirements of the [Corrective Action Plan].

161. IBM has failed to cure its deficient performance.

*Id.* at 280. IBM filed a complaint against the State for breach of contract that same day. Specifically, IBM sought Deferred Fees of $43,416,738 plus $9,369,898.93 for equipment, "pray[ing] for a judgment against the State in the amount of $52,786,636.93, plus applicable interest, and for such further relief as warranted under the contract and Indiana law as the Court deems just and proper. IBM is entitled to both pre-judgment and post-judgment interest, as required under the MSA and Indiana law." *Id.* at 337.

Twelve motions for summary judgment have been filed in this case, three of which have bearing on this appeal. An emergency transfer has also been taken to the Indiana Supreme Court concerning whether Governor Daniels had to submit to a deposition. *See State v. Int'l Bus. Machs. Corp.*, 964 N.E.2d 206 (Ind. 2012). Regarding one of the summary-judgment motions, IBM filed a partial motion for summary judgment on its claim for subcontractor assignment fees. The MSA included fixed-sum "assignment fees" of $5 million or $10 million per subcontract to be paid to IBM post-termination if the State

21

assumed IBM's prime-contractor role within the first seven years. The trial court found

that the State accepted assignment of the seven subcontracts at issue[10] and that the

assignment fees were not an unenforceable penalty as argued by the State because payment

was not triggered by a breach; rather, the court found that the fees were "compensation for

valuable contract rights." Appellant's App. p. 159-60. Finding no genuine issues of

material fact and that IBM had demonstrated that it was entitled to judgment as a matter of

law with respect to its claim for subcontractor assignment fees, the court granted IBM's

motion for partial summary judgment on this issue, thereby awarding IBM $40 million in

assignment fees. *Id.* at 161 (trial court's January 25, 2012 summary-judgment order).

The State filed a motion for summary judgment relating to the impact of the

economic downtown and flooding on IBM's performance. The trial court granted

summary judgment on this issue in favor of the State:

> [T]he Court GRANTS the State's motion for summary judgment number 5,
> and RULES that any contention by IBM at trial that the economic downturn
> or flooding rendered its performance "impossible," or otherwise excuses any
> failure by IBM to meet any of its contractual obligations under the MSA, is
> precluded as a matter of law[.]

*Id.* at 390-91 (trial court's January 25, 2012 summary-judgment order).

This case proceeded to a bench trial before the Honorable David J. Dreyer on

February 27, 2012. The trial lasted six weeks and concluded April 3, 2012. Eight attorneys

appeared for the State, and eleven attorney appeared for IBM. *Id.* at 230. Ninety-two

witnesses testified, and 7500 exhibits were admitted. *Id.* at 231. During trial, the State

moved for reconsideration of the trial court's earlier summary judgment in favor of IBM

---

[10] The subcontracts at issue were for ACS, Arbor, Haverstick, Interactive Intelligence, Phoenix, PostMasters, and RCR.

on subcontractor assignment fees, which the trial court denied. *Id.* at 396 (trial-court order). Then, on July 18, 2012, the trial court issued sixty-five pages of findings of fact and conclusions of law plus an eight-page appendix. In the order, the trial court ruled as follows:

> **Breach for cause or for convenience?**—the trial court found that the State failed to prove that IBM materially breached the MSA and that IBM substantially performed under the contract (which practically meant that the court found that termination was for convenience rather than for cause). *Id.* at 201.
>
> **Subcontractor Assignment Fees**—the trial court affirmed its earlier summary-judgment order that awarded IBM $40 million in assignment fees. *Id.* at 220.
>
> **Deferred Fees**—the trial court found that IBM failed to show that the $43,416,738 claimed in Deferred Fees was reasonable and proportionate as liquidated damages. *Id.* at 224-227.
>
> **Early Termination Close Out Payments**—the trial court found that IBM was entitled to $2,570,621 in Early Termination Close Out Payments due under MSA § 16.6.6, which included actual costs that IBM incurred as a result of the State's premature termination of the MSA.[11] *Id.* at 221-22.

---

[11] According to the trial court's order:

128. IBM is entitled to $2,570,621 in "Early Termination Close Out Payments" due under MSA § 16.6.6. These include actual costs IBM incurred as a result of the State's premature termination. The State's only defense to payment of these costs is that they are not due in the event of termination for cause. The State did not introduce any credible evidence suggesting that IBM did not incur these costs or challenging the amount of these costs. The Early Termination Close Out Payments owed by the State are as follows: (1) $2,305,964.37 in prepared software costs owed under MSA § 16.6.6(3); (2) $31,143.58 in lease termination payments owed under MSA § 16.6.6(3)(C) to end the lease on IBM's Indianapolis office space; (3) $61,284 in improvement costs IBM incurred in improving its Indianapolis offices owed under MSA § 16.6.6(3)(D); and (4) $101,763 in salary and labor costs for IBM employees and $71,466 for Crowe employees idled as a result of the termination, which are owed under MSA § 16.6.6(4)(B) because the State gave less than 75 days notice.

Appellant's App. p. 221-22 (footnotes omitted).

**Equipment**—the trial court found that IBM was entitled to $9,510,795 for the value of the Equipment that the State kept after terminating the MSA. *Id.* at 220.

**Change Order Fees**—the trial court found that IBM was not entitled to fees for four Change Orders because the record showed evidence for only two of the four Change Orders. As for the two Change Orders in the record, the court found that the changes predated the MSA and therefore IBM should have initially incorporated them into the project. *Id.* at 227-28.

**Prejudgment Interest**—the trial court found that IBM was entitled to prejudgment interest and gave IBM thirty days to submit a separate petition calculating the prejudgment interest. *Id.* at 222.

IBM timely submitted a petition calculating the prejudgment interest, to which the State objected on grounds that state law forbids prejudgment interest against the State. Nevertheless, on August 14, the trial court awarded IBM $10,632,333 in prejudgment interest.

The State appeals, and IBM cross-appeals. We held an extended oral argument in this case on November 25, 2013. Both parties then filed post-argument submissions.

**Discussion and Decision**

This case involves the interpretation of a $1.3 billion contract entered into by two sophisticated parties—the State of Indiana—represented by both outside counsel and the Attorney General's Office—and IBM—a multinational technology and consulting company—represented by multiple attorneys. Both parties alleged breach of this more than 160-page contract.

The ultimate goal of any contract interpretation is to determine the intent of the parties when they made the agreement. *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012), *reh'g denied*. We begin with the plain language of the contract, reading

24

it in context and, whenever possible, construing it so as to render each word, phrase, and term meaningful, unambiguous, and harmonious with the whole. *Id.* "A contract is ambiguous if a reasonable person would find the contract subject to more than one interpretation." *Id.* (quotation omitted). If the language is unambiguous, we may not look to extrinsic evidence to expand, vary, or explain the instrument but must determine the parties' intent from the four corners of the instrument. *Bd. of Commr's of Delaware Cnty. v. Evans*, 979 N.E.2d 1042, 1046 (Ind. Ct. App. 2012); *Niezer v. Todd Realty, Inc.*, 913 N.E.2d 211, 215 (Ind. Ct. App. 2009), *trans. denied*. However, if the language is ambiguous, we may look to extrinsic evidence and will construe the terms to determine and give effect to the intent of the parties when they entered into the contract. *Barabas*, 975 N.E.2d at 813. "[C]onstruction of the terms of a written contract is a pure question of law for the court, reviewed de novo." *Harrison v. Thomas*, 761 N.E.2d 816, 818 (Ind. 2002).

## I. Material Breach

The first issue to be determined is whether IBM materially breached the contract. The trial court concluded that the State failed to prove that IBM materially breached the MSA. Whether IBM materially breached the contract impacts other issues in this case. The trial court determined on summary judgment that IBM was not entitled to $43,416,738 in Deferred Fees if it materially breached the contract. Moreover, whether the State must pay Early Termination Close Out Payments depends on whether it terminated the contract for cause or for convenience. Because of the significance of the breach issue, we address it first.

25

According to MSA § 16.3.1(1)(A), in order to terminate the MSA for cause, the State had to prove a breach by IBM that was "material considering this Agreement as a whole[.]" Appellant's App. p. 692. A material breach is one that goes to the heart of the contract. *Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d 165, 175 (Ind. Ct. App. 2007). In determining whether a breach is material, the following five factors are considered:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Collins v. McKinney*, 871 N.E.2d 363, 375 (Ind. Ct. App. 2007); *see also Ream v. Yankee Park Homeowner's Ass'n, Inc.*, 915 N.E.2d 536, 543 (Ind. Ct. App. 2009), *trans. denied*; *Frazier v. Mellowitz,* 804 N.E.2d 796, 803 (Ind. Ct. App. 2004) (adopting the Restatement (Second) of Contracts § 241 (1981)). Whether a breach is material is generally a question of fact to be decided by the trier of fact. *Collins*, 871 N.E.2d 375; *see also Roche Diagnostics Operations, Inc. v. Marsh Supermarkets, LLC*, 987 N.E.2d 72, 83 (Ind. Ct. App. 2013), *trans. denied*.

We also must look to the Performance Measurements set forth in the MSA. Pursuant to MSA § 3.8.1,

> Vendor will ensure that the Services will be performed and delivered in a manner that (i) meets or exceeds the required levels of performance, including the Performance Standards specified in or pursuant to this Agreement, (ii) is effective, efficient and courteous to the Clients, and (iii)

26

uses Commercially Reasonable Efforts[12] to support the State's achievement of its Policy Objectives.

Appellant's App. p. 591. According to MSA § 3.8.2, satisfactory performance of the Agreement by IBM "will be measured by" eight standards:

(1) Adherence to all the terms of this Agreement, including all covenants, obligations, representations and warranties;

(2) Performance in accordance with and compliance with the Modernization Project work plans, schedules, and milestones agreed to by the Parties;

(3) Performance of the Services in accordance with all applicable requirements of this Agreement, including the Performance Standards set forth in Schedule 10 [Performance Standards];

(4) Satisfactory results of Audits by the State, its representatives, or other authorized Persons in accordance with Article 9 (with all results of such Audits being addressed in accordance with the Governance Plan);

(5) Attendance at and participation in the DFR financial review and other meetings conducted from time to time by FSSA (both internally and with the public);

(6) Timeliness, completeness, and accuracy of required reports;

---

[12] "Commercially Reasonable Efforts" means "taking commercially reasonable steps and performing in such a manner as a well managed entity would undertake with respect to a matter in which it was acting in a determined, prudent, businesslike and reasonable manner to achieve a particular result." Appellant's App. p. 761-62.

27

(7) Determination by the State of (i) Vendor's satisfactory performance of the Services[13] and the Delegated Activities,[14] and (ii) Vendor's satisfactory oversight and management of the Subcontractors; and

(8) Vendor's efforts to assist the State in achieving the Policy Objectives.

*Id.* at 591-92.

Because the trial court entered special findings and conclusions according to Indiana Trial Rule 52(A), our standard of review is two-tiered.[15] *Marion Cnty. Auditor v. Sawmill Creek, LLC*, 964 N.E.2d 213, 217 (Ind. 2012) (citation omitted). We first determine whether the evidence supports the findings and then whether the findings support the judgment. *Id.* Appellate courts "shall not set aside the findings or judgment unless clearly erroneous." Ind. Trial Rule 52(A). "In reviewing the trial court's entry of special findings,

---

[13] The MSA defined "Services" as:

the tasks, functions, and responsibilities of Vendor under the Agreement expressly assigned and delegated to Vendor, and any incidental or ancillary tasks, functions, or responsibilities not expressly described in the Agreement but that are necessary and appropriate subtasks for the successful performance of the Services and the Agreement, including Delegated Activities. The Services will include such additional activities as are from time to time agreed between the Parties but do not include Retained Activities.

Appellant's App. p. 776-77.

[14] The MSA defined "Delegated Activities" as:

all functions and responsibilities being performed by the Affected Employees as of the Service Commencement Date, except as modified by the Agreement, the activities set forth in the Statement of Work (but excluding the Retained Activities), and any additional functions that may thereafter be delegated to Vendor by mutual agreement of the Parties.

Appellant's App. p. 764.

[15] Although the parties submitted proposed findings and conclusions, it is not clear whether this was at the trial court's request or in accordance with a Trial Rule 52(A) motion. If the trial court entered findings and conclusions sua sponte, our standard of review is slightly altered. On those issues which the trial court has not found, or for which the findings are inadequate, we treat the judgment as a general one, and we may affirm a general judgment on any legal theory the evidence supports. *Harrison v. Thomas*, 761 N.E.2d 816, 819 (Ind. 2002).

we neither reweigh the evidence nor reassess the credibility of the witnesses." *Sawmill Creek*, 964 N.E.2d at 216 (citation omitted). We view the evidence in the light most favorable to the judgment, and we will defer to the trial court's factual findings if they are supported by the evidence and any legitimate inferences therefrom. *Id.* at 217 (citation omitted). Legal conclusions, conversely, are reviewed de novo. *Id.* "A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts." *Id.* (citation omitted).

The trial court concluded that the State failed to prove that IBM materially breached the contract by employing a balancing test:

> 100. Looking at the whole contract and IBM's whole performance, at least substantial performance is clearly shown as a matter of fact. The State's case extrapolates from a number of general examples of frustrated welfare applicants and State workers, and even attempts to estimate from data that as many as 80,000 or more applications (out of 1 million) were processed late during the 12 measured months of IBM's management. *Taken as true, these examples still have to be balanced against the whole contract and IBM's whole performance showing benefits to the State and adhering to MSA policy objectives.* Accordingly, the heart of the contract remained intact, although sometimes beating irregularly.

Appellant's App. p. 210 (emphasis added). In determining whether any breach went to the heart of the contract, we find that the core of the contract is identified in the following "Policy Objectives" in the MSA:

> The overarching policy objectives of the Modernization Project and this Agreement are (i) to provide efficient, accurate and timely eligibility determinations for individuals and families who qualify for public assistance, (ii) to improve the availability, quality and reliability of the services being provided to Clients by expanding access to such services, decreasing inconvenience and improving response times, among other improvements, (iii) to assist and support Clients through programs that foster personal responsibility, independence and social and economic self-sufficiency, (iv) to assure compliance with all relevant Laws, (v) to assure the protection and

integrity of Personal Information gathered in connection with eligibility determination, and (vi) to foster the development of policies and procedures that underscore the importance of accuracy in eligibility determinations, caseload integrity across all areas of public assistance and work and work-related experience for Clients in the Programs.

*Id.* at 567 (MSA § 1.1(1)). In other words, the essence of the Modernization Project was to provide and expand access to services for welfare recipients in a timely, reliable, and efficient manner within federal guidelines, to discourage fraud, and to increase work-participation rates—all of which were problems that plagued the earlier system. Contrary to the trial court's implication in Conclusion No. 100, whether IBM materially breached the contract does not require balancing the number of benefits the State received versus the number of performance standards that IBM failed. Rather, the issue is whether any breach went to the essence of the contract—to provide and expand access to services for welfare recipients in a timely, reliable, and efficient manner within federal guidelines, to discourage fraud, and to increase work-participation rates.

### A. The State's Arguments

*The State's Dissatisfaction with IBM's Performance.* Although the evidence showed that the State was not satisfied with IBM's performance, the trial court concluded that the State's dissatisfaction with IBM's performance did not support a claim of breach (much less a claim of material breach); instead, it was merely one of eight enumerated ways in which IBM's performance was to be judged.

According to MSA § 3.8.2, satisfactory performance of the Agreement by IBM "will be measured by" eight standards, including "Determination by the State of (i) Vendor's satisfactory performance of the Services and the Delegated Activities." *Id.* at 592. The

30

State presented evidence at trial from several people establishing that the State was not satisfied with IBM's performance, including Brian Whitfield, IBM Vice President of State and Local Government when the MSA was executed. Whitfield testified that the "project didn't perform at a level that I would have found to be satisfactory" and conceded that the State was not satisfied with IBM's performance in 2009 and had a reasonable basis to be dissatisfied. Tr. p. 6381-82. Steve Zaudtke, IBM on-site project executive, similarly testified that there were problems in 2009 with IBM's performance and that overall the State was not satisfied. *Id.* at 6867-68. And John Lyons, IBM's trial representative, conceded that over the course of the six-week trial he never heard any of the witnesses say that IBM's performance was good in 2009. *Id.* at 7670.

> Despite this clear evidence of the State's dissatisfaction, the trial court concluded:

> 107. Beyond Schedule 10, *the State points to record evidence, including confirming documents and testimony by IBM witnesses, that the State was "dissatisfied" with aspects of the Modernization Project (as was IBM), and claims IBM was in breach under § 3.8.2(7).* However, this provision does not say that the State's dissatisfaction will support a claim of breach (much less a claim of material breach), but rather that the State's level of satisfaction is one of eight enumerated ways in which IBM's performance will be judged. As found above, the problems with the Modernization Project that can be attributed to IBM under the contract are not material when compared to the MSA as a whole and the bargained-for benefits that the State received.

Appellant's App. p. 214 (emphasis added).

A party to a contract involving requirements of commercial quality, operative fitness, or mechanical utility may condition its obligation to pay upon that party's satisfaction that the other party's performance meets the applicable standard. *Greg Allen Constr. Co. v. Estelle*, 762 N.E.2d 760, 772-73 (Ind. Ct. App. 2002), *summarily aff'd in pertinent part by* 798 N.E.2d 171 (Ind. 2003), *reh'g denied*. A party's evaluation of the other party's

performance under these criteria will be judged against a reasonable-person standard, and dissatisfaction may not be claimed arbitrarily, capriciously, or unreasonably. *Id.* at 773. A party should be satisfied with another party's performance if a reasonable person in the same circumstances would be satisfied. *Id.*

The State argues that under this standard, it had a reasonable basis to be dissatisfied with IBM's performance and that IBM's unsatisfactory performance is not "immaterial." Although the State's determination of whether IBM's performance of Services was satisfactory was just one standard to be considered, IBM witnesses admitted that the State was and had a reasonable basis to be dissatisfied with its performance. The State's dissatisfaction should have been considered by the trial court in determining whether there was a material breach.

*Failing Performance Standards*. The State argues that the trial court erred by concluding that IBM's failing Key Performance Indicators were not cause to terminate the Agreement because IBM paid liquidated damages under MSA § 15.2.3(3) as an alternative means of performance. Appellant's App. p. 212-13 (Conclusion No. 105). In the event of a breach by IBM, MSA § 15.2.5(3) permitted liquidated damages as follows:

> The Liquidated Damages and Service Level Credits prescribed in Schedule 10 [Performance Standards] and referenced in this Section are not intended to be in the nature of a penalty, but are intended to be reasonable estimates of the State's projected financial loss and damage resulting from Vendor's breach, including financial loss as a result of Modernization Project delays or other events identified in Schedule 10. Accordingly, in the event an event set forth in Schedule 10 occurs, the State may assess Liquidated Damages and Service Level Credits as set forth in Schedule 10.

32

*Id.* at 685. The trial court noted that the State's main argument and focus was the Schedule 10 timeliness metric.[16] *Id.* at 211. Although the trial court found that "[Key Performance Indicator] metrics for timeliness were consistently missing the mark," the court explained that the MSA and Schedule 10 showed that the timeliness metric was "of the same importance as the 19 of 24 [Key Performance Indicators] that the Coalition consistently met, including performance reporting, system availability, document scanning, document indexing, constituent care response time, and Help Center availability." *Id.* at 210, 211. Accordingly, the trial court concluded:

> 105. The [Key Performance Indicators], including timeliness, were associated with identical liquidated damages, in an amount that the State described as "miniscule," a reasonable indicator of the weight the parties gave to these measures in the agreement. . . . The MSA provides that the specified liquidated damages constitute "reasonable estimates of the State's projected financial loss and damage resulting from Vendor's *breach* . . . ." (MSA § 15.2.5(3)). Liquidated damages were paid in lieu of performance and provided IBM with an alternative means of performance that was satisfied by payment (which payment is undisputed). . . . The Court finds based on the complete record in this case, including the testimony of the witnesses, that the Coalition's failures to meet certain Schedule 10 metrics did not constitute a breach of the MSA in light of IBM's payment of liquidated damages.

*Id.* at 212-13.

The State acknowledges that the MSA provided that the liquidated damages prescribed in Schedule 10 were the "sole and exclusive remedy" for certain *damages* arising out of or caused by IBM's Key Performance Indicator failures; however, the MSA also provided that this "shall not limit (i) any applicable State termination rights in Article

---

[16] The trial court specifically found that "[t]he State claims that the Coalition (in this case the primary subcontractor, ACS) consistently missed the [Key Performance Indicators] for Call Center abandonment, timely processing of applications and redeterminations, and the SLMs for adherence to proper process procedures . . . ." Appellant's App. p. 211.

16 . . . ." *Id.* at 685 (MSA § 15.2.5(4)). Notably, MSA § 16.3.1(1)(C) authorized termination for cause, including for:

> a series of breaches of Vendor's obligations, none of which individually, constitutes a breach of this Agreement which is material considering this Agreement as a whole, but which, in view of Vendor's history of breaches, whether or not cured, collectively constitute a breach of this Agreement which is material when considering this Agreement as a whole . . . .

*Id.* at 692. Accordingly, the State argues that treating MSA § 15.2.5(3) liquidated-damages payments as the State's exclusive remedy was "flat error." Appellant's Br. p. 40. We agree. Not only did the MSA address alternative remedies, but it also stated that IBM's paying liquidated damages for Key Performance Indicator failures did not deprive the State of any termination rights, including for-cause termination for a "series" or "history of breaches, whether or not cured." Therefore, the trial court should have considered the IBM Coalition's failures to meet certain Schedule 10 metrics in determining whether there was a material breach.

*IBM's Failure to Satisfy Legal Standards.* The State argues that the trial court's conclusion that IBM's breaches were not material "ignored other MSA provisions and uncontradicted evidence, including that IBM's performance failed to meet Federal legal standards." *Id.* The MSA's first-listed Policy Objective was "to provide efficient, accurate and timely eligibility determinations for individuals and families who qualify for public assistance." Appellant's App. p. 567. Notably, the trial court found that "[Key Performance Indicator] metrics for timeliness were consistently missing the mark." *Id.* at 210. In other words, the IBM Coalition was failing on the very issues that the Policy Objectives deemed to be vital. Accordingly, in determining whether there was a material

34

breach, the trial court should have considered the IBM Coalition's breach of performance obligations on the very matters that the MSA stated were its overarching policy objectives.

In addition, ensuring "compliance with all relevant Laws" was another explicit Policy Objective. *Id.* at 567. The State cites evidence that in late July 2009, which was less than two months before the State terminated the MSA for quality and timeliness issues, CMS—the federal agency overseeing Medicaid programs—found that Indiana was "consistently not meeting Federal eligibility processing requirements." *Id.* at 834. CMS noted that since the Modernization Project's rollout, it was "plagued" "by ongoing issues and complaints that consumers are losing Medicaid benefits or being denied benefits inappropriately." *Id.* The problems included extended wait times for processing enrollment applications and in receiving responses to Call Center inquiries, lack of responses to enrollment applications, and inappropriate disenrollments. *Id.* CMS noted that these problems, which had garnered media attention, "indicate a serious situation in Indiana that is negatively impacting consumers' access to Medicaid." *Id*. at 834, 837. Finding that the State was not in compliance with several provisions of the United States Code and the Code of Federal Regulations, CMS ordered the State to provide its own "Corrective Action Plan (CAP) for ensuring that the Federal eligibility requirements are met." *Id.* at 837. CMS noted that while the State and IBM's Corrective Action Plan was a "good start in the monitoring of IBM's performance," the State needed its own plan. *Id.*

IBM responds that the parties specifically agreed in MSA § 15.2.6(1) that the State's "sole and exclusive" remedy for "failure to meet the Federal Program Targets"[17] was liquidated damages amounting to 50% of the State's federal penalty and that this remedy was available only during Steady State, a phase that was never reached. *See id.* at 686-87. But as the State points out, IBM does not acknowledge the very next sentence in the MSA, which states: "the foregoing shall not limit any applicable termination rights of the State set forth in Article 16 [which governs termination]." *Id.* at 687. Accordingly, the trial court should have considered IBM's failures to meet Federal Program Targets in determining whether to terminate the contract for cause.

*Economic Downturn and Flooding.* The State argues that the trial court improperly considered the economic downturn and flooding as reasons to excuse IBM's performance. We start with the economic recession. Specifically, the court found that two months after the rollout of the pilot region, "the State and the country began to feel the effects of what has been termed the 'Great Recession.'" *Id.* at 185 (Finding No. 42). The court observed that almost immediately, benefit applications increased 21% and the number of processed applications increased 41% compared to the previous year. *Id.* The court dubbed the recession, "the most severe crisis since the Great Depression." *Id.* In addition, the court noted that Indiana's unemployment rate had more than doubled since the MSA was executed and was higher than the national average. *Id.* (Finding No. 43). The court noted that in response to the economic crisis, in February 2009 Congress passed stimulus

---

[17] "Federal Program Targets" are defined as federal TANF minimum work participation requirements for the All Family Participation rate and federal Food Stamp error rate requirements. Appellant's App. p. 686.

legislation, which, among other things, increased the benefits to food-stamp recipients. *Id.* at 186 (Finding No. 45).

The State argues that the trial court wrongly relied on these events because the MSA provided IBM an appropriate remedy "if recession and legislative responses threatened its performance—the Change Order Process." Appellant's Br. p. 42. Specifically, MSA § 4.1.3, entitled Material Assumptions, provided:

> The Parties have negotiated the Fees in reliance upon the material assumptions set forth in Schedule 11 [Material Assumptions] ("Material Assumptions"). The Parties acknowledge that other than such Material Assumptions, Vendor has not relied upon any other assumptions that are material to this Agreement, the Services, or the Fees (or any components thereof). Vendor acknowledges that any changes to any of its internal, implied or inherent assumptions which are not included in the Material Assumptions shall be at its risk and shall not serve as a basis for requesting a Change or an increase in the Fees and that *an inaccuracy or error in any of the Material Assumptions shall not automatically entitle Vendor to any Change which it may request, but any such Change shall be made solely pursuant to the Change Order Process.* At the reasonable request of Vendor or the State, the Parties shall engage in good faith negotiations of any Changes to address any inaccuracy or error in one or more of the Material Assumptions.

Appellant's App. p. 608-09 (emphasis added). The Material Assumptions included that during the contract term, there would be no "material economic downturn in Indiana." *Id.* at 754. Therefore, the State argues, while an inaccuracy or error in any of the Material Assumptions did not automatically entitle IBM to a Change, the MSA provided that IBM could request changes in light of erroneous assumptions—"but any such Change shall be made solely pursuant to the Change Order Process." No such request was made here.

As for flooding, the trial court found:

> 46. Compounding the challenges presented by the economic downturn and the Project's expansion to HIP, Indiana was hit by a series of natural disasters

during 2008, which displaced thousands of Hoosiers from their homes and caused nearly $2 billion in economic damages. As described by the State, "[t]he 2008 disasters in Indiana have been among the worst in our state's history." Eighty-two of Indiana's 92 counties were declared Presidential Disaster Areas during 2008. . . .

*Id.* at 186-87 (footnotes omitted). The trial court also found that "[t]he State directed the reassignment of approximately one third of the State and IBM Coalition workforce 'from every available post,' 'modernized or as-is,' to assist with the processing of tens of thousands of emergency food statement applications" and "thousands of FEMA Individual Assistance applications[.]" *Id.* at 187.

The State again argues that "the parties anticipated and accounted for the implications of unpredictable weather" in the MSA. Specifically, MSA § 21.22 provided:

> In the event that because of [a] Force Majeure Event, Vendor is unable to perform any of its obligations under this Agreement or such performance is rendered impractical, Vendor shall provide notice to the State as soon as practicable and shall use Commercially Reasonable Efforts to resume performance of the Services to the extent practicable, despite the Force Majeure Event.

*Id.* at 732. The MSA's definition of "Force Majeure Event" included "flood." *Id.* at 767. IBM did not give the State notice pursuant to MSA § 21.22.[18]

As for both the economic downturn and flooding, the State also argues that the trial court ignored its pretrial rulings. That is, the State filed a motion for summary judgment relating to the impact of the economic downturn and flooding on IBM's performance. The trial court entered summary judgment in favor of the State, concluding:

> [A]ny contention by IBM at trial that the economic downturn rendered its performance "impossible," or otherwise excuses any failure to IBM to meet

---

[18] However, the trial court found that these disasters affected the rollout of the project, which was eventually suspended by mutual agreement of the parties in September 2008 in Change Order 69 in order to accommodate disaster-relief efforts. Appellant's App. p. 188.

any of its contractual obligations under the MSA, is precluded as a matter of law; and evidence about the claimed impact of the economic downturn on IBM's ability to meet its contractual obligations is irrelevant and inadmissible.

\* \* \* \* \*

Any contention by IBM at trial that flooding rendered its performance "impossible," or otherwise excuses any failure to IBM to meet any of its contractual obligations under the MSA, is therefore precluded as a matter of law; and evidence about the claimed impact of flooding on IBM's ability to meet its contractual obligations is irrelevant and inadmissible.

For these reasons, the Court GRANTS the State's motion for summary judgment number 5, and RULES that any contention by IBM at trial that the economic downturn or flooding rendered its performance "impossible," or otherwise excuses any failure by IBM to meet any of its contractual obligations under the MSA, is precluded as a matter of law[.]

*Id.* at 390-91 (trial court's January 25, 2012 summary-judgment order). In response to this argument, IBM argues that the trial court considered these circumstances "not to *excuse* IBM's performance, but to conduct the required analysis under the Restatement [(Second) of Contracts] as to whether the timeliness failures amounted to a material breach." Appellee's Br. p 37. We find that this difference does not matter. *See* Appellant's Reply Br. p. 34. Because the MSA provided IBM with a remedy in the event of an economic downturn or flooding, the trial court should not have considered the economic downturn and flooding as reasons to excuse IBM's performance.

*Surge in Applications from the HIP.* The State argues that the trial court improperly considered any surge in applications from the HIP as a reason for IBM's performance issues. Specifically, the trial court found that the "HIP significantly increased the scope and cost of the Modernization Project by adding design, development, implementation, continuing services, and reporting requirements." Appellant's App. p. 184 (Finding No.

39

40). The court also found that the "HIP application volume regularly exceeded the State's predictions. . . . The State described this as a significant challenge for the modernized system." *Id.* at 184-85 (Finding No. 41) (citation omitted).

However, the MSA specified procedures for seeking service and fee changes when IBM thought that it was warranted. MSA § 3.4.3(3) provided:

> Upon the occurrence of a Force Majeure Event or any sudden and material increase in the number of Clients utilizing the Services beyond that which might reasonably be anticipated, Vendor shall be entitled to provide the Services at a location other than a Service Location on a temporary basis . . . . Vendor may make this determination in its discretion, and any additional charges associated therewith shall be determined in an equitable manner in accordance with the Change Order Process.

*Id.* at 583-84. In addition, MSA § 3.12.3(1) provided that a change "relating to an expansion of or change to the Services" required a Change Request.[19] *Id.* at 597.

As the State points out, the record shows that IBM "obtained numerous change orders, yielding $177 million in increased fees." Appellant's Br. p. 36. Moreover, the State notes that when the trial court explained that the HIP "significantly increased the scope and cost of the Modernization Project," the court cited an actual change order— Change Order 23 in Exhibit 1500.023. Appellant's App. p. 184 (Finding No. 184). Because the trial court cited a specific change order in its findings, the State contends that IBM received a "double remedy"—"IBM first received more fees; then, when it still did not meet performance standards, its failings were excused." Appellant's Br. p. 46. We agree with the State; in determining whether the breach was material, the trial court should

---

[19] A "Change Request" is "any request by a Party for a Change as contemplated by Section 3.11.3." Appellant's App. p. 761.

40

not have considered any surge in applications from the HIP as a reason for IBM's performance issues.

*The State's Motives for Terminating the MSA.* The State argues that the trial court improperly considered that the State might have had other motives for terminating the MSA. In its findings, the trial court noted that on the same day that the State delivered the MSA termination letter to IBM, Governor Daniels held a press conference in which he commended IBM for its work, citing a number of benefits that IBM had conferred on the State. Appellant's App. p. 199. In addition, Governor Daniels acknowledged, "They [IBM] did try hard. If resources would have fixed the problem, we wouldn't be making this announcement . . . . It wasn't resources. It wasn't effort. It was a flawed concept that simply did not work out in practice." *Id.* at 199-200. In essence, IBM argues that the State did not terminate the MSA for "performance issues," as they have maintained in this litigation.

But as the State points out, a party's motives or reasons for making contract decisions are generally regarded as irrelevant. *See Epperly v. Johnson*, 734 N.E.2d 1066, 1073 (Ind. Ct. App. 2000) (citing *Vernon Fire & Cas. Ins. Co. v. Sharp*, 264 Ind. 599, 349 N.E.2d 173, 180 (1976)); *see also Tuf Racing Prods., Inc. v. Am. Suzuki Motor Co.*, 223 F.3d 585, 589 (7th Cir. 2000) ("In the law of contracts, while procuring a breach by the other party to your contract would excuse the breach, merely having a bad motive for terminating a contract would not. If a party has a legal right to terminate the contract (the clearest example is where the contract is terminable at will by either party), its motive for exercising that right is irrelevant." (citations omitted)).

41

Moreover, Justice Sullivan applied these principles in the earlier decision in this case that vacated the trial court's order to depose Governor Daniels. In his concurring-in-result opinion, Justice Sullivan found it unnecessary to discuss the gubernatorial privilege because—contrary to IBM's contentions—any such testimony was irrelevant: "Neither the Governor's 'assessment of IBM's performance' nor his 'state of mind' bear in any way on whether or not IBM breached the contract or the State owes IBM fees or reimbursement." *Int'l Bus. Machs.*, 964 N.E.2d at 212 (Sullivan, J., concurring in result) (citing *Sharp*, 349 N.E.2d at 180). In determining whether the breach was material, the trial court should not have considered that the State might have had other motives or reasons for terminating the MSA.

### B. IBM's Arguments

IBM, on the other hand, argues that "[o]verwhelming factual findings support the court's finding of no material breach. The vast majority are not even mentioned in the State's brief, much less challenged." Appellee's Br. p. 29. We address each of them.

IBM's first argument is essentially the trial court's balancing test—because the State received an array of benefits, there was no material breach. IBM points to the following benefits that the State received: (1) dramatic improvement in work-participation rates as part of the welfare-to-work program, Appellant's App. p. 204; (2) reduction in fraud, *id.* at 205; (3) programmatic and administrative cost savings totaling approximately $40 million per year, *id.* at 205-06; (4) modern electronic access to the eligibility system, including the online filing of applications, *id.* at 206; (5) the electronic "paperless" system, which was preferred over boxes, *id.*; (6) the Work Flow Management System (WFMS), which the

State carried over to the hybrid system, *id.* at 207; (7) the HIP, which state officials described as "an unqualified success," *id.*; (8) the valuable contribution that the IBM Coalition members made in responding to the 2008 natural disasters, *id.* at 208; and (9) economic development, which, as Governor Daniels explained during his 2009 press conference, brought 1000 new private-sector jobs to Daleville and Anderson, *id.* at 209.

IBM argues that on top of these benefits, the trial court found that IBM's work provided the foundation for the successful hybrid system. As the trial court explained, "Modernization is the foundation on which the State Hybrid system now stands. For better or worse, and through much transition difficulty, the contract, including IBM's efforts, conferred the overall aggregate benefit sought by the State: a new welfare system that works better." *Id.* at 204.

However, as we explained above and as the State points out, IBM misses the point by highlighting the benefits the State received. The State readily concedes that it received benefits under the MSA, "under [which] it paid IBM over $437,000,000." Appellant's Reply Br. p. 28. As the State says, "one would hope the State got *something* for its $437 million." *Id.* Although it is undisputed that IBM met some objectives and provided some important benefits, the question is whether IBM's failures went to the essence of the contract—to provide and expand access to services for welfare recipients in a timely, reliable, and efficient manner within federal guidelines, to discourage fraud, and to increase work-participation rates.

IBM next argues that the breach was not material because the State asked IBM to implement the hybrid system; in other words, if the State was truly dissatisfied with IBM's

43

services, it would not have asked IBM to continue providing services. The trial court found that beginning in September 2009, "the State actively pursued IBM in the hope that it would implement the Hybrid plan" and "[o]nly when the State's budget crisis prevented the parties from reaching an agreement on financial terms did the State decide that it would 'cut[] out the middle man' and terminate the IBM contract." Appellant's App. p. 196, 198 (citation omitted). In addition, after the parties failed to come to an agreement on an IBM-led roll out of the hybrid system, the State urged IBM to continue as the technology vendor. *Id.* at 198.

However, it is not far-fetched that the State would ask IBM, a multinational technology and consulting company, to lead the roll-out of the hybrid system given the time both parties had invested in this venture and the fact that IBM was intimately familiar with both the State's old system and the Modernization Project. And when the parties could not come to an agreement, it is just as reasonable that the State wanted IBM to continue in a lesser role as the technology vendor.

IBM next argues that the trial court found that the State's principal complaint about the Modernization Project resulted from a key feature of the system that the State itself designed and required—reduction of face-to-face interactions.

The trial court found that Governor Daniels "sought to change one of the key requirements that the State had developed, that he had previously approved, and which was specified in the MSA—the move away from face-to-face meetings and greater reliance on multiple points of access to the system." *Id.* at 196. Accordingly, IBM argues that it "cannot be faulted, much less held in material breach, for following the design

44

requirements the State developed and the MSA required." Appellee's Br. p. 31. However, even though the State may have developed a system that resulted in a reduction of face-to-face meetings, IBM nevertheless agreed to implement this design. If IBM did not think that it could carry out this concept, then it presumably would not have executed the MSA. In addition, IBM agreed "to improve the availability, quality and reliability of the services being provided to Clients by expanding access to such services, decreasing inconvenience and improving response times, among other improvements." Appellant's App. p. 567.

IBM also argues that the trial court found that the State's breach allegations revolved around failure to meet Key Performance Indicators for timely processing of applications, but the Key Performance Indicators were not originally intended to apply during the transition period.

The trial court found that the State's main focus was the Schedule 10 timeliness metric; however, IBM was consistently meeting the majority of the Key Performance Indicators when the State announced termination of the MSA in October 2009. *Id.* at 211; *see also id.* ("The MSA and Schedule 10 shows the timeliness metric was of the same importance as the 19 of 24 [Key Performance Indicators] that the Coalition consistently met . . . ."). Notably, the trial court found that the "[Key Performance Indicator] metrics for timeliness were consistently missing the mark." *Id.* at 210. In addition, the trial court found that the Key Performance Indicators were not originally intended to apply during the transition period. However, as the trial court also found, most of the Key Performance Indicators were accelerated pursuant to Change Order 64. *Id.* at 212.

45

Finally, the trial court found that IBM's performance was steadily improving in 2009. The trial court concluded as follows:

> [T]he measured performance of IBM was steadily improving during 2009, especially in the months leading up to the October 2009 termination. Therefore, anything that could be interpreted as an IBM failure not only had a likelihood of being cured, but was apparently in the process of being cured at the time of termination.

*Id.* at 210 (Conclusion No. 99). Accordingly, IBM argues that the likelihood of curing any performance deficiencies counsels against a finding of material breach. IBM cites *Frazier v. Mellowitz*, 804 N.E.2d 796 (Ind. Ct. App. 2004), in support. In *Frazier*, this Court noted that under the Restatement (Second) of Contracts, an injured party is not discharged from his duty to perform unless (1) the breach is material and (2) it is too late for performance or an offer to perform to occur. *Id.* at 803. We noted that in particular, the Restatement (Second) of Contracts § 241 (1981) provides that in determining whether a failure to render or to offer performance is material, several circumstances are significant, including "the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances." *Id.*

We first note that although the trial court concluded that IBM's failure was "apparently" in the process of being cured at the time of termination, this is just one of five factors to consider in determining whether the breach is material. *See Collins*, 871 N.E.2d at 375. In addition, we note that the findings that the trial court used to support this conclusion are not persuasive. As support for this finding, the trial court relied on statements from an attorney general in a September 2009 hearing in *Thornton v. Anne Murphy* in the United States District Court for the Southern District of Indiana. The

46

litigation concerned how long it took the State to process applications.  Not surprisingly, the attorney general, speaking for the defendant, told the judge:

> We looked at what were the causes.  We tried to identify the causes; and we've initiated a number of activities to correct those causes, many of which—they call it Quick Win, but we have made substantial progress in a very short period of time.

Ex. 304, p. 70.  The trial court also cited a late September 2009 email which contained public statements from Secretary Murphy that "a team of vendors led by IBM Corp. has already made improvements in technology and added more staff under a corrective action plan submitted in July"; however, Secretary Murphy added that "the timeliness of processing applications for food stamps, Medicaid and other benefits has not improved." Ex. 111.  This is not persuasive evidence that IBM's performance was steadily improving in 2009.

### C. Conclusion

Although the Modernization Project reduced fraud and provided important benefits to the State, the record also shows that the system had problems from the very beginning, including unanswered calls and the untimely processing of applications.  Appellant's App. p. 183.  Also, in November 2008—approximately a year and a half after Phase 1 was launched—the IBM Coalition met with Secretary Roob to propose changes to the project because of problems including inconsistent feedback, document acceptance and processing, case-processing timeliness, quality, and higher volumes.  Ex. 65, p. 12.  Then, in March 2009, Secretary Murphy sent the IBM Coalition a letter drafted by the State's outside counsel requesting a Corrective Action Plan.  The letter identified thirty-six issues that the State wanted the IBM Coalition to address, including excessive wait times at local

47

offices, incorrectly categorized imaged documents, high turnover of staff, scheduling problems, inaccurate and incomplete data gathering, clients not receiving mailed correspondence, poor communication to all staff, unresolved help-desk tickets, untimely expedited food-stamp processing, excessive wait times for applicant appointments, and failure to process Food Stamp, TANF, and Medicaid applications in a timely manner. Ex. 75. On July 2, 2009, the parties agreed on a Corrective Action Plan that included twenty-two short-term "Quick Wins" and thirty-one long-term initiatives. Appellant's App. p. 192. And in late July 2009, CMS found that since the Modernization Project's rollout, it was "plagued" "by ongoing issues and complaints that consumers are losing Medicaid benefits or being denied benefits inappropriately." *Id.* at 834. The problems included extended wait times for processing enrollment applications and in receiving responses to Call Center inquiries, lack of responses to enrollment applications, and inappropriate disenrollments. *Id.* CMS noted that these problems, which had garnered media attention, "indicate a serious situation in Indiana that is negatively impacting consumers' access to Medicaid." *Id*. at 834, 837. Not surprisingly, the trial court found that the "[Key Performance Indicator] metrics for timeliness were consistently missing the mark." *Id.* at 210. Not only was the public not satisfied with the new system, but—according to three key IBM witnesses—the State was not satisfied with the new system and had a reasonable basis not to be satisfied. The trial court's mission was to determine whether there was a material breach by IBM that went to the essence of this contract. In doing so, the trial court employed a balancing test that weighed the number of benefits that the State received in this contract. But the question before the trial court was not the number of benefits the

State received but whether the heart of this contract was breached by IBM. We find that the heart of this contract was to provide services to the poor in a way that complied with federal law. In this respect IBM's performance, as the trial court explained, "consistently missed the mark." This substandard performance by IBM, $437 million and 36 months later, went to the essence of this contract.

Yet the trial court excused IBM's substandard performance for a number of inappropriate reasons. In particular, the trial court took into account that the Great Recession and an inordinate amount of flooding occurred in Indiana during the course of the contract. While that is all true, this multinational company under the terms of the contract had the ability to request more money from the State through Change Orders to account for these disasters, but it did not. Strikingly, the trial court excused IBM's performance in part because of the increase in the HIP applications, although IBM was paid extra to handle the increase in the HIP applications.

At the same time, the trial court discounted that the State and frankly IBM were both dissatisfied with IBM's performance, that IBM consistently missed the mark on Key Performance Indicators, and that the federal government imposed penalties on the State for IBM's failings.

We find that the failings of IBM went to the heart of the contract—to provide welfare services to our poorest in a timely, efficient, and reliable manner within federal guidelines—and that this constituted a material breach of the contract. Accordingly, we remand this case to the trial court to determine the State's damages and offset any damages awarded to IBM.

## II. Assignment Fees

The State contends that the trial court erred in awarding IBM $40 million in subcontractor assignment fees. The issue of assignment fees was determined by the trial court on summary judgment and reaffirmed in its July 2012 order. The State first argues that IBM has waived this issue by pleading no operative facts and making no demand for relief for assignment fees in its amended complaint. Second, the State argues that the subcontractor assignment fees are liquidated-damages clauses amounting to an unenforceable penalty.

### A. Waiver

The State first argues that IBM has waived this issue by pleading no operative facts and making no demand for relief for assignment fees in its amended complaint. IBM responds that it properly requested assignment fees in its amended complaint by generally stating that it was asking "for such further relief as warranted under the contract and Indiana law and as the Court deems just and proper." Appellant's App. p. 337.

Indiana Trial Rule 8(A) requires a pleading to contain "(1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for relief to which the pleader deems entitled." In addition, Trial Rule 8(F) provides that "[a]ll pleadings shall be so construed as to do substantial justice, lead to disposition on the merits, and avoid litigation of procedural points." Indiana's notice pleading rules do not require the complaint to state all elements of a cause of action. *Shields v. Taylor*, 976 N.E.2d 1237, 1245 (Ind. Ct. App. 2012). Notice pleading merely requires pleading the operative facts so as to place the defendant on notice as to the evidence to be presented at trial. *Id.*

50

Therefore, under notice pleading, the issue of whether a complaint sufficiently pleads a certain claim turns on whether the opposing party has been sufficiently notified concerning the claim so as to be able to prepare to defend it. *Id.* A complaint's allegations are sufficient if they put a reasonable person on notice as to why a plaintiff is suing. *Id.*

Here, although IBM's amended complaint did not specifically request assignment fees, the State was on notice. In its answer to IBM's amended complaint, the State raised as a defense: "IBM is unable to recover any damages, penalties, fees, costs, profits, *subcontractor assignment fees*, deferred fees, damages, loans, or other monies by whatever name or label that violate the public policy and/or Constitution of the State of Indiana, including Article X." Appellant's App. p. 343 (emphasis added). In addition, when IBM propounded an interrogatory to the State asking for the "factual basis for each affirmative defense asserted in the State's Answer," the State responded that "IBM has also made demand for payment of assignment of Subcontract fees contained in MSA § 14.8.1." *Id.* at 160. Because the State was on notice as to assignment fees, we find that IBM has not waived this issue and therefore proceed to the merits.

*B. The Merits of Assignment Fees*

Next, the State argues that the $40 million in subcontractor assignment fees are liquidated damages amounting to an unenforceable penalty. IBM responds that the assignment fees were actually consideration for valuable contract rights. Appellee's Br. p. 18.

Consideration is "[s]omething (such as an act, a forbearance, or a return promise) bargained for and received by a promisor from a promisee; that which motivates a person

51

to do something, esp[ecially] to engage in a legal act." *Black's Law Dictionary* 324 (8th ed. 2004). This Court has defined it as a "'bargained for exchange' whereby the promisor accrues a benefit or the promisee accepts a detriment." *Kelly v. Levandoski*, 825 N.E.2d 850, 860 (Ind. Ct. App. 2005). "A benefit is a legal right given to the promisor to which the promisor would not otherwise be entitled." *Id.* (quoting *DiMizio v. Romo*, 756 N.E.2d 1018, 1023 (Ind. Ct. App. 2001), *trans. denied*).

On the other hand, a liquidated-damages clause is "[a] contractual provision that determines in advance the measure of damages if a party breaches a contract." *Black's Law Dictionary* 949 (8th ed. 2004). In general, "[a] liquidated damages clause provides for the forfeiture of a stated sum of money upon a breach of contract without proof of damages." *Weinreb v. Fannie Mae*, 993 N.E.2d 223, 232 (Ind. Ct. App. 2013), *trans. denied*. The purpose of these clauses is to compensate a non-breaching party when damages from a breach of contract would be uncertain, difficult, or impossible to ascertain. *See id.* While liquidated damages are generally enforceable, contractual provisions constituting penalties are not. *Dean V. Kruse Found., Inc. v. Gates*, 973 N.E.2d 583, 591 (Ind. Ct. App. 2012), *trans. denied*. The difference between a penalty and liquidated damages is that a penalty is imposed to compel performance under the contract by making a breach so expensive that a party would not breach the contract even if its damages would be lessened by doing so, whereas liquidated damages are an amount of money that reasonably estimates the non-breaching party's damages as a result of the breach. *Id.* In

52

other words, a penalty discourages efficient breach of a contract where a valid liquidated-damages clause does not.[20]

The question, then, is whether the assignment fees were included in the MSA as consideration for valuable contract rights or to compensate IBM for damages sustained in the event of a termination of the contract.

MSA § 14.8.1(3) specified fixed sums to be paid post-termination if the State stepped into the shoes of IBM and assumed the prime-contractor role with respect to the subcontractors. If the State terminated the contract with IBM and assumed IBM's subcontracts during the first seven years, the State was required to pay assignment fees to IBM in the amount of $10 million for the ACS subcontract and $5 million for each of the other subcontracts:

> (3) In the event the State exercises its right to accept assignment of one or more Subcontracts pursuant to this Section 14.8, the State shall not be required to pay to Vendor the Early Termination Close Out Payments[21] that are directly attributable to the performance of such assigned Subcontract(s), but, instead for each Subcontract assigned to the State, the State shall pay Vendor the following upon the applicable Services Termination Date[22]:
>
> > (A) if the replaced Subcontractor is ACS, (i) the amount of the Deferred Fees for Vendor's Subcontract with ACS as set forth in

---

[20] An efficient breach is "an intentional breach of contract and payment of damages by a party who would incur greater economic loss by performing under the contract." *Black's Law Dictionary* 200 (8th ed. 1999). The concept of efficient breach stems from the efficient-breach theory, which is "[t]he view that a party should be allowed to breach a contract and pay damages if doing so would be more economically efficient than performing under the contract." *Id.* at 555.

[21] Early Termination Close Out Payments are defined in MSA § 16.6.6(3). These Early Termination Close Out Payments include Deferred Fees as listed in Schedule 24. Appellant's App. p. 702.

[22] "Services Termination Date" means "the date upon which [IBM] is no longer providing the Services for which the State is no longer paying the Fixed Fees, with respect to all or that portion of the Services Terminated by the State." Appellant's App. p. 776.

Schedule 24 [Deferred Fees][23], plus (ii) Ten Million Dollars ($10,000,000), if the applicable Services Termination Date is within Contract Years one through seven, or Five Million Dollars ($5,000,000) if the applicable Services Termination Date is within Contract Years eight through ten; and

(B) for each assigned Subcontract with a Key Subcontractor (other than ACS) and each other assigned Primary Subcontract (other than those Subcontracts with an aggregate contract value of less than Five Million Dollars ($5,000,000)), Five Million Dollars ($5,000,000), if the applicable Services Termination Date is within Contract Years one through seven, or Two Million Five Hundred Thousand Dollars ($2,500,000) if the applicable Services Termination Date is within Contract Years eight through ten;

provided, however, that the provisions of this Section 14.8.1(3) shall not apply if all the Services[24] contained within an applicable Subcontract[25] are terminated by the State pursuant to Sections 16.3.1 [termination for cause], 16.3.4(2) [insolvency event], or 16.3.4(3) [wrongful conduct], except that the unamortized balance of the Deferred Fees shall still be payable in such event.

Appellant's App. p. 681-82.[26]

---

[23] Deferred Fees include fees that ACS deferred into the future. Ex. 1653. The fees due to ACS under Schedule 24 were amortized over a three-year period from fiscal year 2007 through fiscal year 2009.

[24] "Services" means:

the tasks, functions, and responsibilities of Vendor under the Agreement expressly assigned and delegated to Vendor, and any incidental or ancillary tasks, functions, or responsibilities not expressly described in the Agreement but that are necessary and appropriate subtasks for the successful performance of the Services and the Agreement, including Delegated Activities.

Appellant's App. p. 776-77. Put differently, services means all services of the Vendor (IBM) and all subcontractors that are provided to the State. While the State terminated IBM's services for cause, it continued to work with the subcontractors and renegotiated with all but one of the subcontractors.

[25] "Subcontract" means "any Contract between Vendor and a Subcontractor with respect to or involving the performance of any of the Services or the Delegated Activities, or any part thereof." Appellant's App. p. 779.

[26] There was no unamortized balance remaining for ACS, the only subcontractor in Schedule 24, because the State paid their fees by the end of fiscal year 2009.

After the State terminated the MSA, the State assumed the ACS subcontract and six others to keep key subcontractors working for about one month in order to continue providing FSSA services while it negotiated new subcontracts. Appellant's Br. p. 5; Oral Arg. at 17:10, *available at* http://goo.gl/0jyxtB; *see also* Tr. p. 4721-23 (noting that the State never intended to assume the contracts as they existed under the MSA and instead planned to renegotiate them). The State rejected an eighth subcontract, Crowe, because "[t]he value wasn't there." Appellee's App. p. 96. According to the State, "the cost of the service versus the value received was not considered to be worth continuing." *Id.* Accordingly, IBM invoiced the State $40 million for assignment of these seven subcontracts—$10 million for the ACS subcontract and $30 million for the six others. *See* Appellant's App. p. 889.

The trial court concluded that the fees were consideration for a valuable contract right. *See* Appellee's Br. p. 18 ("The court found that the provision of the MSA requiring the State to pay subcontractor assignment fees was not a liquidated-damages provision— let alone an unenforceable penalty . . . ."). Specifically, the trial court concluded on summary judgment:

> Under Indiana law, a contract provision constitutes a "penalty" if it imposes a grossly excessive financial payment for a *breach* of the contract or poor performance. Here, it is undisputed that the MSA's plain language does not condition payment of the . . . fees on a breach of contract. In fact, it is undisputed that the subcontractor assignment fees constitute compensation for valuable contract rights, and not a financial payment to compensate a party for breach of contract. Thus, they do not constitute a financial penalty, much less an unenforceable penalty.

Appellant's App. p. 160-61 (citations omitted). The trial court reaffirmed this ruling in its July 2012 order:

55

123. MSA § 14.8.1(3) clearly states that "the State shall pay" the subcontractor assignment fees if it accepts assignment of the subcontracts (which the State did here), regardless of whether there was a termination for cause. As the Court previously ruled during summary judgment, IBM is entitled to Forty Million Dollars ($40,000,000.00) for such fees.

*Id.* at 220.

We agree with the trial court and IBM that these assignment fees were the price to which the State agreed to purchase IBM's interest in the subcontracts. The State paid the $40 million assignment fee to IBM in consideration for the State accruing the legal right to assume IBM's subcontracts. Brian Whitfield, IBM Vice President of State and Local Government when the MSA was executed, stated that IBM generally does not permit its clients to assume its subcontracts, but that it allowed the subcontractors to be assignable in this particular contract at the request of the State. *Id.* at 362. Indeed, this benefit was substantial, as it is not customarily permitted in other services contracts that IBM negotiates. *Light v. NIPSCO Indus.*, 747 N.E.2d 73, 77 (Ind. Ct. App. 2001) ("A benefit is a legal right given to the promisor to which the promisor would not otherwise be entitled."), *reh'g denied*, *trans. denied*.

In assuming these contracts, the State received certain benefits in consideration for the $40 million it paid in assignment fees. The State received the benefit of a packaged deal of contracts that were already written to conform to their needs. Had IBM not allowed the State to assume its subcontracts, the State would either have had to rewrite and renegotiate new contracts with the same subcontractors or find new subcontractors. According to IBM, these contract negotiations were long and expensive. Oral Arg. at 42:58, *available at* http://goo.gl/0jyxtB; *see also* Ex. 8908, p. 9. By assuming IBM's

subcontracts, the State bypassed the lengthy and expensive process of renegotiating the contracts or finding new contractors for the services provided under the MSA.

Additionally, the State received the benefit of a fixed contract price. The prices negotiated between IBM and its subcontractors were fixed for a ten-year period. Had the State not negotiated this assignment provision in the contract, the subcontractors could have demanded more money to continue working with the State upon termination of the MSA at the end of the Disengagement Period. Oral Arg. at 41:50.

Furthermore, the State received the benefit of IBM hiring and training the employees of the subcontractors. Working with the subcontractors directly after IBM had trained the subcontractor's employees would have been considerably less expensive to the State. The cost associated with training the subcontractors and their employees is not insubstantial.

All of this evidence supports the conclusion that these assignment fees were consideration and not liquidated damages. The State wanted the ability to assume IBM's subcontracts for the reasons stated and therefore asked that the ability to assume the contracts be included in the MSA. The State knew that the ability to assume IBM's subcontracts benefitted them and determined that the benefit was worth $40 million. We determine that the fees are consideration and not liquidated damages.

Our conclusion is bolstered by the fact that these fees are not contingent upon a breach of the contract, but instead are contingent on the State's assumption of IBM's subcontracts. Generally, liquidated-damages clauses are intended to compensate in the event of a breach when damages are uncertain or difficult to determine. Here, IBM would

be damaged, and the State would be unjustly enriched, if the State chose to assume IBM's subcontracts even if the State did not breach the MSA.

Nonetheless, the State argues that the assignment fees are a set amount meant to penalize the State in the event that the State terminates the contract—whether by the State's breach or by the State terminating the contract for convenience—rather than payment for a valuable contract right. But many of the cases the State cites concerned fees due only when a party breaches the contract or when a party terminates after a breach. *See A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 1001 (7th Cir. 1992) (determining that the administrative fee was a liquidated-damages provision after determining that one of the litigants breached the contract); *see also Doral Bank, PR v. Fed. Home Loan Mortg. Corp.*, 2010 WL 3984667 (E.D. Va. Oct. 7, 2010); *CMG Realty of Conn., Inc. v. Colonnade One at Old Greenwich Ltd. P'ship*, 653 A.2d 207 (Conn. App. Ct. 1995); *Allison-Williams Co. v. Viasource Funding Grp., LLC*, 2010 WL 2346621 (N.J. Super. Ct. App. Div. June 9, 2010). Finally, while *Mau* does consider the enforceability of cancellation fees as a liquidated-damages clause where a contract was terminated for convenience, the cancellation fees in that case were contingent upon termination. *Mau v. L.A. Fitness Int'l, LLC*, 749 F. Supp. 2d 845 (N.D. Ill. 2010). Here, however, the assignment fees were contingent on the State assuming the subcontracts and not on the termination of the contract.

Even still, the State could have avoided these fees while at the same time terminating the contract. As argued by IBM both in its brief and at oral argument, the State had the ability to terminate the contract without paying the assignment fees. *See* Appellee's Br. p.

19; Oral Arg. at 42:32, *available at* http://goo.gl/0jyxtB.  MSA § 16.6.1 required IBM to provide Disengagement Services pursuant to a Disengagement Plan continuing for up to a period of twelve months.  During this time, the State could have found and negotiated with new subcontractors, or it could have abandoned the Modernization Project and chosen to implement a new system.  Instead, it chose to assume IBM's subcontracts and continue working with the subcontractors.  Because the State could have terminated the contract, not paid the $40 million in assignment fees, and operated under the Disengagement Plan until it found replacement contractors, the assignment fees were not contingent on the termination or breach of the contract.  For all these reasons, we determine that the assignment-fees provision was consideration.

But this does not end our inquiry.  In the first portion of this opinion, we determined that IBM materially breached the MSA.  Generally, "[a] party first guilty of a material breach of contract may not maintain an action against or recover damages from the other party to the contract." *Ream*, 915 N.E.2d at 547.  A breaching party may, however, recover the value of what he or she has provided in quantum meruit. *Am. Nat'l Bank & Trust Co. v. St. Joseph Valley Bank*, 180 Ind. App. 546, 554, 391 N.E.2d 685, 687 (1979), *reh'g denied*.  "To prevail on a claim of *quantum meruit*—also referred to as unjust enrichment— the plaintiff must establish that a measurable benefit has been conferred upon the defendant under such circumstances that the defendant's retention of the benefit would be unjust." *King v. Terry*, 805 N.E.2d 397, 400 (Ind. Ct. App. 2004) (citing *Inlow v. Inlow*, 797 N.E.2d 810, 816 (Ind. Ct. App. 2003), *trans. denied*).  The value of services rendered is a question of fact for the trial court, but the value of services is not necessarily equivalent to

consideration. *See Nunn Law Office v. Rosenthal*, 905 N.E.2d 513, 520 (Ind. Ct. App. 2009).

Here, the trial court, in determining that the assignment fees were not liquidated damages, determined that they represented payment for a valuable contract right. We agree with the trial court.

The subcontracts themselves were valuable. Not only would the State receive the benefit of a packaged deal of contracts that were already written to conform to their needs, but they would bypass the lengthy process of renegotiating contracts with new subcontractors. Additionally, in assuming the subcontracts, the State would benefit from a negotiated fixed contract price for the remainder of the ten-year period. Otherwise, the subcontractors would have had the ability to leverage their negotiating position and increase the contract price. Also, the State saved the substantial cost of retraining an army of employees as IBM had already trained the subcontractors' employees in the system that IBM had put into place.

But most importantly, the State's conduct in the negotiations and afterward indicates that this contractual right was of value to them. The State, through both its highly competent outside and inside counsel, agreed that the value to the State of assuming these subcontracts was $40 million. We cannot ignore the fact that the State, a highly sophisticated party, determined after several months of negotiations that $40 million was the value of the State's right to assume IBM's subcontracts.

But even more telling is that after the State terminated the contract with IBM, the State chose to assume certain subcontracts while not assuming at least one other

subcontract. Out of the eight subcontracts, the State chose not to assume the Crowe subcontract, because "[t]he value wasn't there." Appellee's App. p. 96. According to the State "the cost of the service versus the value received was not considered to be worth continuing." *Id.* By admitting that the Crowe subcontract did not have value to the State, the State impliedly agreed that the other seven subcontracts assumed by them were "worth" the price.

Based on the benefits the State received in assuming IBM's subcontracts and the conduct of the State both during the negotiations of the MSA and after, we agree with the trial court that the assignment fees represent value to the State in the ability to assume these subcontracts. Because there was a measurable benefit conferred upon the State under such circumstances, the State's retention of the benefit would be unjust. IBM is therefore entitled to $40 million in assignment fees notwithstanding a finding of material breach.

### III. Early Termination Close Out Payments

### *A. Deferred Fees*

In its cross-appeal, IBM argues that the trial court erred in denying judgment on its claim for $43,416,482 in Deferred Fees. The State responds that the trial court did not err and, in any event, Deferred Fees are not payable if the MSA is terminated for cause.

When construing the language of a contract, we must determine and effectuate the intent of the parties. *Ryan v. Lawyers Title Ins. Corp.*, 959 N.E.2d 870, 875 (Ind. Ct. App. 2011). We must "read the contract as a whole and will attempt to construe the contractual language so as not to render any words, phrases, or terms ineffective or meaningless." *Id.* In doing so, "[w]e must accept an interpretation of the contract that harmonizes its

provisions, rather than one that places the provisions in a conflict." *Id.* Additionally, when "construing a contract we presume that all provisions were included for a purpose, and if possible we reconcile seemingly conflicting provisions to give effect to all provisions." *Id.* If a contract contains both "general and specific provisions relating to the same subject, the specific provision controls." *Id.*

Using these rules, we must determine whether Deferred Fees are payable only upon a termination for convenience or whether Deferred Fees are payable regardless of how the contract is terminated. MSA § 16.6.6, entitled "Closeout Payments," provided:

> (1) In the event of a Termination of this Agreement for any reason (other than a Termination by expiration), the State shall pay Vendor, to the extent applicable, the charges set forth in Sections 16.6.6(2) and 16.6.6(3)(F) below. *In the event of a Termination of this Agreement for any reason* (other than on expiration or upon a Termination as set forth in Sections 16.3.1 [Termination for Cause], 16.3.4(2), 16.3.4(3), or 16.5, in any of which events, Vendor shall not be entitled to Early Termination Close Out Payments), *the State shall pay the Early Termination Close Out Payments set forth in Section 16.6.6(3)*, 16.6.6(4) and 16.6.6(5) and subject to Section 16.6.6(6) if applicable.

Appellant's App. p. 702 (emphases added). MSA § 16.6.6(3) then provided:

> Vendor's and its Subcontractors' Early Termination Close Out Payments (as applicable and without duplication) shall be as follows:
>
> * * * * *
>
> (F)    Vendors and its Subcontractors' unamortized balance of the Deferred Fees, as set forth in Schedule 24 [Deferred Fees].

*Id.*

The State filed a motion for summary judgment alleging that IBM was not entitled to Deferred Fees if the MSA was terminated for cause. The State argued that because Section 16.6.6(1)'s second sentence (partially emphasized above) provided that IBM was not entitled to Early Termination Close Out Payments—which included Deferred Fees—

in specified termination situations—including termination for cause—IBM was not entitled to Deferred Fees on termination for cause. In contrast, IBM argued that because Section 16.6.6(1)'s first sentence said that Deferred Fees would be paid on termination "for any reason" other than MSA expiration, it was entitled to Deferred Fees. Essentially, IBM argued that there was no conflict between the two provisions. *See* Tr. p. 62-63.

In order to harmonize these seemingly conflicting provisions, the State argued that Section 16.6.6(1)'s qualifying phrase "to the extent applicable" in the first sentence referred to termination situations in which IBM did not receive Deferred Fees, which situations were then specifically identified in the next sentence. The trial court agreed with the State:

> IBM's claim to be entitled to Deferred Fees on termination for cause rests on its reading of Section 16.6.6(1)'s first sentence in isolation. IBM's argument that the sentence's qualifying phrase "to the extent applicable" refers only to the amount of Deferred Fees payable, depending on when termination occurs, also leaves that sentence in conflict with the next sentence—which says IBM is not entitled to Early Termination Close Out Payments, which include Deferred Fees, on termination for cause. If one reading of a contract puts it[s] provisions in "conflict" while another brings them "into harmony," then "[t]he law requires this Court to accept [the] interpretation [that] harmonizes the provisions of the contract."
>
> The State's reading—under which Section 16.6.6(1)'s first sentence's qualifying phrase "to the extent applicable" refers to termination situations in which IBM is not entitled to Deferred Fees, which situations are then specified in the next sentence—does harmonize the two sentences. The State's reading also harmonizes with other MSA provisions.

Appellant's App. p. 384-85 (citations omitted). The court granted summary judgment in favor of the State on this issue. *Id.* at 386-87.

63

We agree with the trial court's interpretation of Section 16.6.6(1) that Deferred Fees are not payable to IBM in the event that the MSA was terminated for cause. The contract is ambiguous because the first sentence of Section 16.6.6(1) required the State to pay IBM the fees in Section 16.6.6(3)(F), which are Deferred Fees. *Id.* at 702. However, in the second sentence, the contract stated that if the State terminated for cause, insolvency, wrongful conduct, or a mutual termination, it would not be required to pay any of the payments in Section 16.6.6(3), which included Deferred Fees. *Id.*

We read the first sentence's qualifying phrase "to the extent applicable" to refer to termination situations in which IBM was not entitled to Deferred Fees. The second sentence clarified situations when the specified Deferred Fees were applicable—namely, that such fees were payable unless there was a termination for cause, an insolvency event, wrongful conduct, or a termination by mutual agreement. In other words, the first sentence of this section applied to situations not listed in the second sentence, such as termination for convenience. This reading is the only way to harmonize the two sentences as well as other provisions in the MSA without rendering any part meaningless. Because we have concluded that there was a material breach, the State terminated for cause, and the contract does not require payment of Deferred Fees upon termination for cause, IBM is not entitled to Deferred Fees.

### B. Other Early Termination Close Out Payments

The trial court determined that IBM was entitled to $2,570,621 in "Early Termination Close Out Payments" due under MSA § 16.6.6. Specifically, the trial court determined that the State owed IBM: (1) $2,305,964.37 in prepared software costs owed

under MSA § 16.6.6(3); (2) $31,143.58 in lease termination payments owed under MSA § 16.6.6(3); (3) $61,284 in improvement costs IBM incurred in improving its Indianapolis offices owed under MSA § 16.6.6(3)(D); and (4) $101,763 in salary and labor costs for IBM employees and $71,466 for Crowe employees idled as a result of the termination, which are owed under MSA § 16.6.6(4)(B) because the State gave less than 75 days' notice. *Id.* at 221-22. According to the trial court's July 2012 order, the State's only defense to payment of these costs was that they are not due in the event of termination for cause. *Id.*

Because we have now determined that IBM materially breached the contract, the State is not required to pay these Early Termination Close Out Payments. MSA § 16.6.6(1) states that:

> In the event of a Termination of this Agreement for any reason (other than on expiration or upon a Termination as set forth in Sections 16.3.1 [Termination for Cause], 16.3.4(2), 16.3.4(3), or 16.5, in any of which events, Vendor shall not be entitled to Early Termination Close Out Payments), the State shall pay the Early Termination Close Out Payments set forth in Section 16.6.6(3), 16.6.6(4) and 16.6.6(5) and subject to Section 16.6.6(6) if applicable.

*Id.* at 702. In other words, if the MSA is terminated for cause, the State is not required to pay IBM Early Termination Close Out Payments as enumerated in Sections 16.6.6(3), 16.6.6(4), and 16.6.6(5). Because we have now determined that the MSA was materially breached, the State is not required to pay IBM the $2,570,621 in Early Termination Close Out Payments.

### IV. Equipment Costs

65

The State argues that the trial court erred in ordering it to pay IBM $9,510,795[27] for Equipment costs.

MSA § 3.4.7 provided that the State was entitled to use IBM's "Equipment"[28] "during the Term" of the MSA, which ended on December 14, 2009. Appellant's App. p. 585. MSA § 16.6.1(4) then detailed how the transfer of and payment for the Equipment was to occur:

> The Disengagement Plan shall provide the details regarding the transfer of all dedicated Equipment to the Successor, to the extent included within the Early Termination Close Out Payments or otherwise purchased by the Successor, including the machine types, serial number, attached peripherals, manufacturer, warranty details, and, if applicable, any packing and shipment details. Upon receipt of payment for such Equipment, Vendor shall provide the Successor with an agreed upon bill of sale and other appropriate documents of transfer.

*Id.* at 700. As contemplated by the MSA in Section 16.6.1, *see supra* note 9, the State and IBM executed a Disengagement Plan on December 11, 2009. According to the Disengagement Plan, the State was required to pay IBM $4.4 million for Disengagement Services. In addition, Schedule A—Transfer of Dedicated Equipment of the Disengagement Plan listed the dedicated Equipment (including the machine type, serial number, attached peripherals, manufacturer, warranty details, and, if applicable, any

---

[27] The State notes that this figure is higher than the amount that IBM invoiced it.

[28] The MSA defined "Equipment" as:

telephone systems, computer equipment, machines or hardware and other hardware or items of tangible personal property necessary for, or used in, the performance of the Services or the operation of the System, which are provided to the State by Vendor and on which the System will operate for providing the Services to clients, including all associated attachments features, accessories and peripheral devices.

Appellant's App p. 766.

66

packing and shipment details) that the State wished to be transferred.[29]  *Id.* at 871.  IBM invoiced the State $9,349,654.93 for the Equipment that the State kept.  *Id.* at 889. Although the parties do not list the Equipment that the State kept, Exhibits 350 and 351 do. Specifically, these exhibits are emails from the State that list the Equipment that the State "took over from IBM during disengagement."  *See* Ex. 351.  The State never paid IBM's invoice.

The trial court's July 2012 order addressed Equipment costs as follows:

124. IBM is entitled to $9,510,795, the unchallenged appraised value of the Dedicated Equipment the State retained after terminating the MSA, *regardless of whether IBM materially breached the MSA*.  "[T]he parties agree that the Equipment at issue was transferred to the State pursuant to the MSA." 1/25/12 Order (Replevin) at 2.  "It is further undisputed that the State did not pay IBM's invoice for the Equipment."  *Id.*  The State investigated any discrepancies in the list of Equipment at issue until resolved, and did not offer any expert opinion challenging the appraisal by IBM's expert, Ron Savill, who found that the fair market value of the Equipment is $9,510,795. The Court finds Mr. Savill's analysis to be sound and credible.

125. The State agreed that it only had a right to use the Equipment during the Term of MSA (MSA § 3.4.7), and that if it wanted to keep the Equipment, it would have to be "purchased by the Successor [here, the State]" (MSA § 16.6.1(4)).  The State agreed that it would not receive a bill of sale transferring title for the Equipment until "receipt of payment for such Equipment." (*Id.*)  The State breached the MSA by keeping the Equipment and refusing to pay the bill.

126. The State argues that the Dedicated Equipment should be considered an "equipment cost" that falls within the Early Termination Close Out Payments, which it maintains are only payable in the event of termination for convenience.  Again, the State's position is contradicted by the MSA.  The MSA provides that if the State wants to keep the Equipment, it must pay for the Equipment "to the extent included within the Early Termination Close Out Payments *or otherwise purchased by the Successor*" and that IBM is only required to issue a bill of sale transferring title "upon receipt of payment for such Equipment." (MSA § 16.6.1(4) (emphasis added)).  Thus, even if

---

[29] It actually said that IBM shall provide this information "on or about November 13."  Appellant's App. p. 871.  And then the State would specify whether it wished the equipment to be transferred.  *Id.*

IBM were not entitled to payment for the Equipment as an ETCOP, Section 16.6.1(4) dictates that the State "otherwise purchase" the Equipment if it wanted to keep it.

127. Consistent with these provisions, the evidence shows that even after the State sent a "for cause" notice of termination, the State recognized that IBM owned the Equipment and that the State was required to pay for it. Thus, after notifying IBM that the State wanted the Equipment, the State's Doug Elwell acknowledged that he expected an invoice from IBM. IBM invoiced the State and provided "supporting documentation" for the invoice. And the State budgeted to pay IBM $9.5 million "for acquiring all hardware." Nonetheless, it never paid the invoice or returned the Equipment. IBM is entitled to the fair market value of the Equipment ($9,510,795) under the MSA's plain language.

Appellant's App. p. 220-21 (emphasis in Conclusion No. 124 added) (footnote and citations omitted).

The State argues that under the MSA, IBM is not entitled to Equipment costs because the contract was terminated for cause. *See* Appellant's Reply Br. p. 28. Specifically, the State points out that MSA § 16.6.6(1) provided that if the MSA was terminated for cause, then IBM "shall not be entitled to Early Termination Close Out Payments," which—pursuant to Section 16.6.6(3)(A)—included "Vendor's and its Subcontractors' equipment costs net of any applicable depreciation or amortization as of the Services Termination Date." Appellant's App. p. 702 (MSA); Appellant's Br. p. 36-37. As illustrated above in the trial court's Conclusion No. 126, the trial court, however, found that the State was required to pay for the Equipment even if the contract was terminated for cause. This is because MSA § 16.6.1(4) provided that if the State wanted to keep the Equipment, it must pay for the Equipment "to the extent included within the Early Termination Close Out Payments *or otherwise purchased by the Successor*." Appellant's App. p. 221 (Conclusion No. 126). "Thus, even if IBM were not entitled to

68

payment for the Equipment as an [Early Termination Close Out Payment], Section 16.6.1(4) dictates that the State 'otherwise purchase' the Equipment if it wanted to keep it." *Id.*

We agree with the trial court that although IBM was not entitled to Equipment costs as an Early Termination Close Out Payment because the MSA was terminated for cause, MSA § 16.6.1(4) still required the State to "otherwise purchase" the Equipment that it wanted to keep. If the State did not want to pay for any Equipment, then it should have returned it. However, it is undisputed that the State kept over $9.5 million in Equipment; in fact, there are emails from State personnel documenting the Equipment it kept. It is apparent that the State went through the process of selecting pieces of IBM's Equipment to keep. *See* Ex. 351 (listing, among other things, 339 servers, 4289 workstations, 6859 computer monitors, 157 X Series servers, 81 VM servers, 193 P Series IBM, and 19,630 licenses). The State cannot expect to keep millions of dollars in expensive Equipment for free. Therefore, the State must pay for the Equipment that it kept.

Nevertheless, the State still argues that it should not have to pay for the Equipment by directing our attention to a chart, *see* Appellant's App. p. 873-83, in the Disengagement Plan, which was the contract that governed the services IBM provided during the transition from the modernized system to the hybrid system. The State notes that the chart indicated that MSA § 16.6.1 was "Not Applicable" during the transition period. *Id.* at 880. Therefore, the State's argument continues, the State did not have to pay for any IBM Equipment, and its $4.4 million payment to IBM for Disengagement Services covered the

Equipment, too. The State, however, does not read the Disengagement Plan closely enough.

According to the section in the Disengagement Plan entitled "1.0 Statement of Work":

> The scope of Disengagement Services under section 16.6.1 of this MSA is agreed to as follows:
>
> 1.1 OVERVIEW
>
> The State, on behalf of the Family and Social Services Administration (FSSA), has requested that IBM provide continued Application Development/Maintenance ("AD/M") Disengagement Services for a portion of the currently implemented software applications that enable the Modernization Project. IBM shall provide production support, system maintenance (break/fix) and minor enhancements as and to the extent set forth in this Statement of Work. In the event of any conflict between the Terms of this Statement of Work and the Master Services Agreement (MSA), this Statement of Work shall take precedence.

Ex. 472, p. 28. According to the section in the Disengagement Plan governing pricing, the State agreed to pay IBM $4,412,200 for AD/M Services. *Id.* at p. 36. Finally, according to "2.1 Applicability of Terms and Conditions Contained in the MSA," the chart the State relies on—"Attachment A"—"shows the extent to which the Terms and Conditions of the MSA apply to the AD/M Services provided under the Disengagement Plan SOW [Statement of Work]." *Id.* at p. 39. In other words, the chart specified which provisions of the MSA applied to the AD/M Services IBM was performing during the transition period under the Disengagement Plan. Importantly, the chart did not displace IBM's contractual rights to recover for breach of any of those provisions during the term of the MSA or IBM's right to recover the property that it owned. In fact, the Disengagement Plan specifically

70

provided that IBM reserved it rights under the MSA. *Id.* at p. 1. Therefore, the State must pay IBM $9,510,795 for Equipment costs.

## V. Change Order Fees

Also in its cross-appeal, IBM argues that the trial court erred in concluding that it was not entitled to Fees for four Change Orders—71, 102, 119, and 133—totaling $931,928. MSA § 3.11.1, entitled Mandatory Changes, provided that the State may direct IBM to modify its Services to comply with changes in the law that affected the Agreement:

> (1) In the event of any Legal Change which in the State's determination affects this Agreement or affects Vendor's performance of the Services, the State may direct Vendor to modify the Services and any of the Attachments (to the extent such Attachments describe the scope of Services), as may be necessary in the State's discretion to comply with applicable Law following the Legal Change, as set forth in this Section 3.11.

Appellant's App. p. 594. "Legal Change" means:

> (i) any change in applicable Laws and (ii) any determination made by the State in its discretion that a change in the Services (or any of the Attachments to the extent describing the Services) or any of the Retained Activities is necessary or appropriate to comply with Applicable Law or to respond to any directive (whether formal or informal) from any Governmental Body with jurisdiction over, or regulatory authority with respect to, any of the Programs.

*Id.* at 770. "Mandatory Change" is defined as a "Legal Change" or a "Directed Change." *Id.* at 771.

Once the State determined that there was a Legal Change, the State "shall deliver notice to Vendor of modifications the State will require to implement a Mandatory Change, the effective date of a Legal Change (if applicable), and the date by which the State requires the modification to be implemented ('Change Notice')." *Id.* at 595 (MSA § 3.11.2). Within fifteen days following receipt of a Change Notice, IBM must prepare and deliver to the

71

State and the Change Control Board a written Change Analysis, which must include an evaluation of the impact of the proposed change on the then-current scope, price, and performance of the Services. *See id.* at 597 (MSA § 3.12.1(5): "any changes to the Fees, including an analysis, with supporting documentation, of the reasons Vendor believes the Fees will be materially impacted by the proposed Change"). According to MSA § 3.12.2, the "Parties will cooperate with each other in good faith in discussing the scope and nature of each Change Request and related Change Analysis. . . . The Parties will evidence any Change *by executing a written Change Order* containing a description of the Change . . . ." *Id.* (emphasis added).

In the event of a dispute over Change Order Fees, MSA § 3.12.3 guided the parties as follows:

> (2) If a Mandatory Change materially affects the scope, schedule, cost and/or manner of performing the Services ("Material Change"), the Parties will execute appropriate Change Orders to implement the Mandatory Change and will negotiate in good faith any changes in the Fees to reflect the impact of the Mandatory Change on the Services and the costs thereof. Otherwise, there will be no change in the Fees arising out of a Mandatory Change.

*Id.* at 597-98.

The trial court found that IBM was not entitled to Fees for the four Change Orders, reasoning:

> 144. IBM claims four mandatory "law change" change orders allow fees for extra work under the MSA. But the record only shows evidence for Change Orders 119 and 133, and is insufficient for both.
>
> 145. The "law changes" in these change orders both pre-dated the MSA and should have been incorporated by IBM initially into the project.
>
> 146. CR 119 related to changes required by the Deficient [sic] Reduction Act *of 2005*. CR 133 related to changes required by FNS to comply with

72

provisions in 7 C.F.R. 273.2.  The last time 7 CFR 273.2 was amended prior to CR 133 was in *2003*.

147. IBM failed to show why it is entitled to payment from the State for making changes to comply with laws passed prior to the enactment of the MSA for which IBM's processes and procedures have already been in compliance.

*Id.* at 227-28 (citations omitted).

IBM first argues that the trial court erred in finding that it did not introduce evidence for Change Orders 71 and 102.  But IBM did not introduce executed written Change Orders for 71 and 102; rather, it introduced *Change Request Forms*.  *See* Appellee's App. p. 213-14, 215-16.  It also introduced internal documents calculating the costs of the Change Orders should they become final.  *Id.* at 257 (Ex. 2718), 258 (Ex. 2719).  Because the record does not contain executed written Change Orders for 71 and 102, the trial court did not err in concluding that IBM was not entitled to Fees for Change Orders 71 and 102.

As for Change Orders 119 and 133, the State's sole argument is that IBM failed to prove that these Change Orders materially affected the scope, schedule, cost, and/or manner of performing services pursuant to MSA § 3.12.3(2) and therefore IBM was not entitled to any Fees.  The State, however, has misread this provision of the MSA, which provided:

(2) If a Mandatory Change materially affects the scope, schedule, cost and/or manner of performing the Services ("Material Change"), *the Parties will execute appropriate Change Orders to implement the Mandatory Change and will negotiate in good faith any changes in the Fees to reflect the impact of the Mandatory Change on the Services and the costs thereof.*  Otherwise, there will be no change in the Fees arising out of a Mandatory Change.

Appellant's App. p. 597-98 (emphasis added).  Under this provision of the MSA, the parties could only execute a Change Order if a Mandatory Change (which included a Legal

73

Change) materially affected the scope, schedule, cost, and/or manner of performing the Services. Here, there is no dispute that the parties executed Change Orders 119 and 133; therefore, there must have been a material effect to the scope, schedule, cost, and/or manner of performing the Services in order for there to have been a Change Order in the first place. However, because there is a Change Order does not mean that there is an automatic change in the Fees. As MSA § 3.12.3(2) instructed, the parties "will negotiate in good faith any changes in the Fees to reflect the impact of the Mandatory Change on the Services and the costs thereof. Otherwise, there will be no change in the Fees arising out of a Mandatory Change." *Id.* at 598.

Change Order 119 shows that the Vendor's Proposal was $487,448, but the State's Offer was $0.00. Appellee's App. p. 222. Similarly, for Change Order 133, the Vendor's Proposal was $46,340, but the State's Offer was $0.00. *Id.* at 227-28. The trial court, however, found that IBM was not entitled to Fees for these Change Orders because "IBM failed to show why it is entitled to payment from the State for making changes to comply with laws passed prior to the enactment of the MSA for which IBM's processes and procedures have already been in compliance." Appellant's App. p. 228. The trial court erred in making this conclusion. Although Change Order 119 referenced the Deficit Reduction Act of 2005, which was already in existence when the MSA was executed, Change Order 119 was necessitated, at least in part, by laws enacted by the Indiana General Assembly to take effect on October 1, 2009—long after the MSA was executed. *See, e.g.*, Appellee's App. p. 217-23 (Change Order 119 referencing P.L. 14-2009); Ind. Code § 12-15-2-23 (as added by P.L. 14-2009 to become effective October 1, 2009).

74

As for Change Order 133, the plain language of the Change Order makes clear that it was dictated by a change in the existing law that took place after the MSA was executed: "This change request incorporates required changes sent to the State by the U.S. Department of Agriculture Food and Nutrition Service in a memo dated July 17, 2009 as a result of an annual review." Appellee's App. p. 226.

Therefore, the trial court's basis for denying IBM judgment on its claim for Fees for Change Orders 119 and 133 is mistaken. We therefore remand this issue to the trial court for it to determine the amount of Fees IBM is entitled to for Change Orders 119 and 133.

## VI. Prejudgment Interest

The State argues that the trial court erred by awarding IBM $10,632,333 in prejudgment interest. IBM argues that the State has waived this issue and that in any event, the trial court correctly ordered prejudgment interest based on the MSA's plain language.

### A. Waiver

IBM requested prejudgment interest in its complaint. In its answer, the State denied that IBM was entitled to prejudgment interest and generally asserted that IBM's claims were barred "by the doctrine of sovereign immunity." Appellant's App. p. 342, 343. According to the trial court, "Neither party ever wrote, argued or litigated any specific issue of interest, prejudgment or otherwise, before or during trial. *Id.* at. 244. However, in its post-trial brief, IBM requested prejudgment interest. Appellee's App. p. 86-87. In its July 18, 2012 order, the trial court awarded IBM prejudgment interest as follows:

> 129. IBM is entitled to prejudgment interest under I.C. § 24-4.6-1-103. The applicable statutory rate for prejudgment interest is 8%. I.C. §§ 24-4.6-1-102 & 24-4.6-1-103. IBM shall submit a separate petition for calculated prejudgment interest within thirty (30) days.

Appellant's App. p. 222. On August 8, IBM timely filed a petition requesting $10,632,333 in prejudgment interest. *Id.* at 541. IBM attached to its petition a document in which it calculated this prejudgment interest. *Id.* at 544 (Exhibit A). On August 13, the State filed an objection, arguing that "IBM misled the Court in including a claim for prejudgment interest in its proposed entry. Indiana law forbids prejudgment interest against the State, save in limited circumstances not applicable here." *Id.* at 545. The next day, August 14, the trial court awarded IBM $10,632,333 in prejudgment interest and deemed the State's objection a post-judgment motion under Trial Rule 59 as a motion to correct error. *Id.* at 239, 242.

The parties later entered into a stipulation extending the time to rule if the objection was deemed a Trial Rule 59 motion (which the State disputed). *Id.* at 551. After additional briefing and a hearing, on October 22, 2012, the trial court entered an Order Overruling State's Objection to Prejudgment Interest and Deemed Motion to Correct Errors. Specifically, the trial court found that the State "failed to defend prejudgment interest at trial, IBM is otherwise entitled to prejudgment interest in the Judgment, and [the] State further waived any objection." *Id.* at 243-44.

IBM argues on appeal that the State has waived its challenge to prejudgment interest because it "did not contest IBM's request for prejudgment interest until *after* the court entered its 'Findings of Fact, Conclusions of Law, and Judgment for IBM.'" Appellee's Br. p. 20. IBM argues that the State attempts to avoid waiver by characterizing the trial court's July 18 order as interlocutory—"even though the State's own notice of appeal, which was filed before the court awarded prejudgment interest, denominated the appeal as

76

from a 'Final Judgment, as defined by [the appellate rules],' and certified that the case 'does *not* involve an interlocutory appeal.'" *Id.* at 21 (quoting Appellee's App. p. 91-92).

We find no waiver by the State.[30] According to Indiana Appellate Rule 2(H), "A judgment is a final judgment if (1) it disposes of all claims as to all parties[.]" That is, a "final judgment" is a judgment that "disposes of all issues as to all parties, to the full extent of the court to dispose of the same, and puts an end to the particular case as to all of such parties and all of such issues." *Minott v. Lee Alan Bryant Health Care Facilities, Inc.*, 998 N.E.2d 273 (Ind. Ct. App. 2013) (quotation omitted), *reh'g denied*. "A final judgment reserves no further question or direction for future determination." *Id.* (quotation omitted). Accordingly, the judgment did not become final until August 14, which is when the trial court actually calculated prejudgment interest, because the July 18 order did not dispose of all claims between the parties. *See id.* (holding that although the trial court titled the judgment "Final Judgment," the issue of restitution was still undecided and therefore the judgment "was not a true final judgment").

---

[30] As for whether the State failed to defend prejudgment interest at trial and therefore lost on the merits for this reason, the trial court elaborated in its October 2012 order as follows:

> When the State denied IBM's allegation of prejudgment interest, the issue became part of IBM's burden at trial. Moreover, when the State asserted its affirmative defense of sovereign immunity, the State also carried a burden at trial. The record clearly shows that the State did nothing to oppose IBM's prejudgment claim, or to prove its sovereign immunity defense. Therefore, it lost on the merits.

Appellant's App. p. 245 (footnote and citations omitted). Notably, earlier in the same order, the trial court said, "*Neither party* ever wrote, argued or litigated any specific issue of interest, prejudgment or otherwise, *before or during trial*." *Id.* at 244 (emphasis added). Therefore, it appears that *neither party* addressed prejudgment interest at trial, not just the State. It was IBM's burden to prove it was entitled to prejudgment interest, not just the State's burden to disprove. Since the trial court said that neither party addressed prejudgment interest either before or during trial, the State cannot be singled out as the only loser on this basis.

As for whether the State timely filed a notice of appeal, the record shows that the State filed three notices of appeal to preserve its appellate rights. The State filed its first notice of appeal shortly after the trial court issued its July 18 order—but before the trial court ruled on the State's objection to IBM's petition for prejudgment interest. The State filed its second notice of appeal on September 12, which was within thirty days of the trial court's August 14 orders awarding IBM prejudgment interest and deeming the State's objection a partial motion to correct errors. And the State filed its third and final notice of appeal on November 2, which was within thirty days of the trial court's October 22 Order Overruling State's Objection to Prejudgment Interest and Deemed Motion to Correct Errors. The State later moved to consolidate its three notices of appeal.[31] In so doing, the State explained that it believed the trial court had not entered a final and appealable order until August 14, because it was not until then that the trial court had resolved all claims between the parties. The State clarified that it filed its first notice of appeal as a precautionary measure to preserve its right to appeal if the July 18 order was later deemed final and appealable.

Although IBM argues that the State's notice of appeal denominated this appeal as coming from a final judgment and certified that the case did not involve an interlocutory appeal, IBM misleadingly cites to the State's *first* notice of appeal without mentioning the State's two other notices of appeal. After examining the complicated procedural history of this case, it is apparent that the State has never conceded that the trial court's July 18 order

---

[31] The State filed motions in this Court on September 19, 2012, and November 7, 2012, both of which we granted. *See State v. Int'l Bus. Machs. Corp.*, Cause No. 49A02-1208-PL-645 (Ind. Ct. App. Oct. 3, 2012); *State v. Int'l Bus. Machs. Corp.*, Cause No. 49A02-1211-PL-875 (Ind. Ct. App. Dec. 11, 2012).

was a final judgment; rather, the State filed its first notice of appeal as a safeguard. Because the record shows that the State has made multiple efforts at the trial-court level to challenge the trial court's award of prejudgment interest, the State has not waived this issue for appellate review.[32] We therefore proceed to the merits.

### B. Merits

Prejudgment interest is appropriate in a breach of contract action when the amount of the claim rests upon a simple calculation and the terms of the contract make such a claim ascertainable. *Kummerer v. Marshall*, 971 N.E.2d 198, 201 (Ind. Ct. App. 2012), *reh'g denied*, *trans. denied.* The award of prejudgment interest is considered proper when the trier of fact does not have to exercise judgment in order to assess the amount of damages. *Id.*

In addition, sovereign immunity bars prejudgment interest against the State "unless it binds itself by contract or statute to pay interest." *Ind. Dep't of Pub. Welfare v. Chair Lance Serv., Inc.*, 523 N.E.2d 1373, 1379 (Ind. 1988); *see also State v. Hensley*, 716 N.E.2d 71, 78 (Ind. Ct. App. 1999), *trans. denied*; *Lake Cnty. v. State ex. rel. Manich*, 631 N.E.2d 529, 536 (Ind. Ct. App. 1994), *reh'g denied*. This application of sovereign immunity derives from the principle that a State does not authorize its officers to incur obligations on its behalf unless by contract or statute. *Chair Lance*, 523 N.E.2d at 1379 (citing *United*

---

[32] The parties cite federal case law for the following proposition. "A court that has decided to award prejudgment interest has not entered an appealable final judgment until that amount has been calculated"; however, there is an exception where the uncalculated interest is free from dispute and is readily ascertainable from the record—that is, where only a ministerial calculation is required and the appellate court could perform it as easily as the trial court. *Student Loan Mktg. Ass'n v. Lipman*, 45 F.2d 173, 175 (7th Cir. 1995); *Pace Commc'ns, Inc. v. Moonlight Design, Inc.*, 31 F.3d 587, 591 (7th Cir. 1994). We do not need to adopt federal law to resolve this issue, but even if we did, we would find that the exception did not apply here because this case does not involve a simple ministerial calculation.

*States v. North Carolina*, 136 U.S. 211 (1890)).   Courts indulge every reasonable presumption against waiver of fundamental constitutional rights, including state sovereign immunity.  *See Oshinski v. N. Ind. Commuter Transp. Dist.*, 843 N.E.2d 536 (Ind. Ct. App. 2006).

The MSA contains three provisions that address interest and sovereign immunity. MSA § 18.2, entitled Interest, provides: "Vendor may seek to recover from the State overdue payments under this Agreement, and interest thereon, as described in Section 4.7." Appellant's App. p. 715.  In turn, MSA § 4.7, entitled Interest on Overdue Payments, provides:

> The State will in good faith perform its required obligations hereunder and does not agree to pay any penalties, liquidated damages, interest, or attorneys' fees, except as permitted by Laws[33] of the State, *including IC 5-17-5, IC 34-54-8, and IC-34-13-1.*  Notwithstanding the provisions contained in IC 5-17-5, to the extent required by Laws generally applicable to contractors doing business with the State, any liability resulting from the State's failure to make prompt payment shall be based solely on the amount of funding originating from the State and shall not be based on funding from federal or other sources.

---

[33] "Laws" means:

all statutes, codes, ordinances, decrees, rules, or regulations having the force of law issued by the State or by any Governmental Body having jurisdiction over the Services, the State or the Vendor; municipal by-laws; judicial or arbitral or administrative or ministerial or department or regulatory judgments, orders, decisions, rulings or awards of general applicability; policies and guidelines having the force of law, or any provisions of such laws, including general principles of common and civil law and equity, binding on or applicable to the Person referred to in the context in which such word is used; as well as rules, regulations, standards, policies, circulars and procedures having the force of law enacted or promulgated by any regulatory body or pursuant to any statutory authority or requirement, which relate to the Services and are applicable to Vendor.  "Law" means any one of the foregoing.

Appellant's App. p. 770.

*Id.* at 613 (emphasis added). Finally, MSA § 18.3, entitled No Waiver of Sovereign Immunity, provides:

> The Parties expressly agree that no provision of this Agreement is in any way intended to constitute a waiver by the State of any immunities from suit or from liability that the State may have by operation of law. The State acknowledges and agrees that the forgoing sentence does not limit Vendor's rights against the State under IC 34-13-1.

*Id.* at 715.

The State first argues that none of the three statutes listed in MSA § 4.7 authorizes prejudgment interest against the State. We look at each of them.

Indiana Code section 5-17-5-1 provides that every state agency shall pay a late-payment penalty at a rate of one-percent per month on amounts due on written contracts for public works, personal services, goods and services, equipment, and travel whenever the state agency fails to make a timely payment. Chapter 5-17-5, however, does not permit a late-payment penalty for claims subject to a good-faith dispute. A "good faith dispute" includes a contention by the State that the goods delivered or the services rendered were of less quantity or quality than ordered or specified by contract, faulty, or installed improperly, or any other reason giving cause for the withholding of payment by the State until such dispute is settled. Ind. Code § 5-17-5-2(b). IBM did not seek interest at the one-percent-per-month rate established in Section 5-17-5-1.

Indiana Code chapter 34-54-8 does not govern prejudgment interest. Indiana Code chapter 34-51-4—which Indiana Code chapter 34-54-8 references—governs prejudgment interest in tort actions, but it does not authorize prejudgment interest in tort actions against the State. *See* Ind. Code § 34-54-8-4 ("Prejudgment interest is governed by IC 34-51-4.");

81

Ind. Code § 34-51-4-4 ("This chapter does not impose liability for prejudgment interest on the state . . . .").

Finally, Indiana Code chapter 34-13-1, which governs express and implied contract claims against the State, allows post-judgment interest against the State, not prejudgment interest. *See* Ind. Code § 34-13-1-6 ("Whenever, by final decree or judgment, a sum of money is adjudged to be due any person from the state, an execution shall not issue but the judgment shall draw interest at an annual rate of six percent (6%) from the date of the adjournment of the next ensuing session of the general assembly until an appropriation is made by law for the payment and the judgment is paid.").

Sovereign immunity bars prejudgment interest against the State unless the State binds itself by contract or statute to pay such interest. Pursuant to the terms of the MSA, the State did not waive sovereign immunity and did not agree to pay interest "except as permitted by Laws of the State, *including IC 5-17-5, IC 34-54-8, and IC-34-13-1.*" Appellant's App. p. 613 (emphasis added). None of these statutes, however, authorizes the 8% prejudgment interest that the trial court ordered here. Nevertheless, IBM argues that it is a well-settled principle of construction that a list following the term "including" is non-exclusive and implies that the list or items enumerated are merely examples.[34] Appellee's Br. p. 24. Therefore, IBM's argument continues, the State agreed to pay prejudgment interest because prejudgment interest is authorized by other Indiana "laws." The State responds that if MSA § 4.7 "means [that] the State 'agreed' to pay interest authorized in

---

[34] IBM does not cite MSA § 1.4(2), which provides that "the word 'including' shall mean 'including, without limitation' and words of similar effect, unless the context shall indicate otherwise." Appellant's App. p. 570.

any circumstance by any 'law,' what is the point of citing IC 5-17-5, IC 34-54-8, IC 34-13-1 or any other statute?" Appellant's Br. p. 17. We agree with the State that it did not bind itself to pay prejudgment interest.

This construction makes even more sense when looking at the contract as a whole, as we must. Under MSA § 18.3, IBM can bring contract actions against the State pursuant to Indiana Code chapter 34-13-1 (which authorizes post-judgment interest but not prejudgment interest), but the State is otherwise not waiving sovereign immunity. Under MSA § 18.2, IBM may seek to recover "overdue payments" and "interest thereon, as described in Section 4.7." MSA § 4.7 then states the general rule that the State does *not* agree to pay interest and then cites the three exceptions, none of which apply here. Construing MSA § 4.7—which says that the State "does not agree" to pay any interest except in certain circumstances—into something that says that the State does agree to pay interest in all circumstances—renders MSA § 4.7 essentially meaningless. Although we did not take a simple path to arrive at an answer, it is still clear that the State did not bind itself to pay prejudgment interest by statute or contract. Accordingly, the trial court erred by awarding IBM prejudgment interest.

## Conclusion

We affirm the trial court's award of $40 million in assignment fees and $9,510,795 in Equipment fees to IBM, affirm the trial court's denial of Deferred Fees to IBM, reverse the trial court's award of $2,570,621 in Early Termination Close Out Payments and $10,632,333 in prejudgment interest to IBM, and remand the case to the trial court to determine the amount of fees IBM is entitled to for Change Orders 119 and 133 and to

determine the State's damages and offset any damages awarded to IBM as a result of IBM's material breach of the contract.

Affirmed in part, reversed in part, and remanded.

BAKER, J., concurs.

FRIEDLANDER, J., concurs in part and dissents in part with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| STATE OF INDIANA | ) | |
| | ) | |
| Appellant/Cross - Appellee, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1211-PL-875 |
| | ) | |
| INTERNATIONAL BUSINESS MACHINES | ) | |
| CORPORATION, | ) | |
| | ) | |
| Appellee/Cross - Appellant. | ) | |
| | ) | |

**FRIEDLANDER, Judge, concurring in part and dissenting in part.**

I believe the trial court applied the correct standard in determining that IBM did not materially breach the Master Services Agreement (MSA). I therefore respectfully dissent from the portion of the Majority's opinion that holds to the contrary. As a result, I also dissent from the resultant reversal of the trial court's award of early termination closeout payments to IBM in the amount of $2.6 million. Upon my conclusion that IBM did not materially breach the MSA, I also believe that service investment fees are recoverable in the amount of $20.8 million, as are transition fees. I would remand to the trial court for determination of the appropriate amount of transition fees. I agree with the Majority in all other respects, namely that IBM is entitled to $40 million in assignment fees, $9.5 million in equipment fees, and fees associated with Change Orders 119 and 133, but is not entitled to prejudgment interest and fees associated with Change Orders 71 and 102.

My primary point of disagreement with the Majority concerns the standard to be employed in deciding whether IBM's breach was "material". According to § 16.3.1(1)(A) of the MSA, in order to terminate the MSA for cause, the State was required to prove a breach by IBM that was "material considering this Agreement as a whole". *Appellant's Appendix* at 692. As I believe the very language of this provision suggests it should, the trial court employed a balancing test in which it considered IBM's failures in the context of the entirety of its obligations under the MSA. The Majority concluded this was error. In so doing, I believe the Majority inaccurately describes the test applied by the trial court as "balancing the number of benefits the State received versus the number of performance standards IBM failed." Slip op. at 30. Described in this fashion, it sounds as though the trial court merely performed a mathematical calculation whereby it compared the benefits realized by the State to IBM's breaches. I believe the trial court's analysis was much more thorough and nuanced than that.

As a general matter, whether a breach is material is a question of fact to be decided by the trier of fact. *Ream v. Yankee Park Homeowners Ass'n, Inc.* 915 N.E.2d 536 (Ind. Ct. App. 2009), *trans. denied*. In making that determination, as the Majority notes, the trier of fact generally considers five factors, including: (1) the extent to which the injured party will be deprived of a reasonably expected benefit; (2) the extent to which the injured party can be compensated for the deprived benefit; (3) the extent to which the party failing to perform will suffer forfeiture; (4) the likelihood of curing the failure taking into account all of the circumstances, including reasonable assurances; and (5) the extent to which the failing party's performance comported with standards of good faith and fair dealing. *Id.* I

86

believe that this test is at odds with, and superseded by, the test that the MSA specifies

should be applied in this circumstance.

The MSA provided that the performance of services under its provisions would

conform to the following standard:

> Vendor will ensure that the Services will be performed and delivered in a manner that (i) meets or exceeds the required levels of performance, including the Performance Standards specified in or pursuant to this Agreement, (ii) is effective, efficient and courteous to the Clients, and (iii) uses Commercially Reasonable Efforts to support the State's achievement of its Policy Objectives.

*Appellant's Appendix* at 591. According to the MSA, IBM's performance would be

evaluated against the following performance goals identified for IBM in the MSA:

(1)     Adherence to all the terms of this Agreement, including all covenants, obligations, representations and warranties;

(2)     Performance in accordance with and compliance with the Modernization Project work plans, schedules, and milestones agreed to by the Parties;

(3)     Performance of the Services in accordance with all applicable requirements of this Agreement, including the Performance Standards set forth in Schedule 10 [Performance Standards];

(4)     Satisfactory results of Audits by the State, its representatives, or other authorized Persons in accordance with Art. 9 (with all results of such Audits being addressed in accordance with the Government's Plan);

(5)     Attendance at and participation in the DFR financial review and other meetings conducted from time to time by FSSA (both internally and with the public);

(6)     Timeliness, completeness, and accuracy of required reports;

(7)     Determination by the State of (i) Vendor's satisfactory performance of the Services and the Delegated Activities, and (ii) Vendor's satisfactory oversight and management of the Subcontractors; and

(8)     Vendor's effort to assist the State in achieving the Policy Objectives.

*Id.* at 591-92.  The Majority cites, and presumably considers, these performance benchmarks in its analysis of the materiality question, but does so in a manner that rejects the trial court's "balancing" methodology.  In so doing, I believe the Majority effectively subjugates the MSA's expressed test for materiality in favor of the general test set out in *Collins v. McKinney*, 871 N.E.2d 363 (Ind. Ct. App. 2007).  I believe the trial court got it right on this point.

The MSA itself requires evaluating a breach for materiality by considering it vis-à-vis the MSA "as a whole."  *Appellant's Appendix* at 692.  Indeed, it seems to me that performance under a contract of this breadth and complexity, whose goals and desired outcomes include some that are not susceptible to quantitative measurement, can be measured only in this manner, i.e., by considering the nature and extent of the nonconforming performance in the context of the entirety of what is required under the contract.  The Majority's approach, on the other hand, permits a finding of material breach, with the attendant harsh results to the breaching party, upon the finding of "any breach [that] went to the essence of the contract", which is to say in the present case any breach that affects the provision and expansion of access to services for welfare recipients in a timely, reliable, and efficient manner.  It seems to me that, in view of the scope and breadth of the services IBM was required to perform under the contract, such a vigorous definition of "material breach" doomed from the beginning IBM's effort to avoid committing a material breach.

As the Majority aptly notes, we will not set aside findings or a judgment unless they are clearly erroneous. Ind. Trial Rule 52(A). A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Farmers Mut. Ins. Co. of Grant & Blackford Cnties. v. M Jewell, LLC*, 992 N.E.2d 751 (Ind. Ct. App. 2013), *trans. denied*. In announcing its conclusion and applying the test for material breach described above, the trial court explained its conclusion that IBM had not materially breached the contract, as follows:

> Looking at the whole contract and IBM's whole performance, at least substantial performance is clearly shown as a matter of law. The State's case extrapolates from a number of general examples of frustrated welfare applicants and State workers, even attempts to estimate from data that as many as 80,000 or more applications (out of 1 million) were processed late during the 12 measured months of IBM's management. Taken as true, these examples still have to be balanced against the whole contract and IBM's whole performance showing benefits to the State and adhering to MSA policy objectives. Accordingly, the heart of the contract remained intact, although sometimes beating irregularly.

*Appellant's Appendix* at 210.

The trial court noted that the State's main argument in favor of material breach focused on Schedule 10 timeliness metrics. The court noted that this metric was not identified in the MSA as more important than nineteen of twenty-four KPIs that IBM consistently met. The Majority disapproves of this approach to the question of whether IBM materially breached the contract, explaining:

> Contrary to the trial court's implication in Conclusion No. 100, whether IBM materially breached the contract does not require balancing the number of benefits the State received versus the number of performance standards that IBM failed. Rather, the issue is whether any breach went to the essence of the contract – to provide and expand access to services for welfare recipients in a timely, reliable, and efficient manner within federal guidelines, to discourage fraud, and to increase work-participation rates.

Slip op. at 30. The Majority thus holds that materiality does not depend upon the scope of the breach relative to the entire contract. Rather, it concludes that a breach is material if it "went to" the provision and expansion of access to services for welfare recipients in a timely, reliable, and efficient manner. *Id.* Considered in isolation and not placed in context, this seemingly means that if there is a single problem concerning a prospective welfare recipient's receipt of welfare benefits, at least with respect to gaining access to benefits in a timely, reliable, and efficient manner, then IBM is guilty of material breach. A standard that discounts context in this manner is too harsh.

Additionally, the Majority concludes that the trial court erroneously failed to consider the State's dissatisfaction with IBM's performance in determining whether a material breach had occurred. I believe this mischaracterizes the trial court's analysis. In fact, the trial court noted there was evidence that the State was dissatisfied with aspects of IBM's work. For instance, the trial court noted that "the State's level of satisfaction is one of eight enumerated ways in which IBM's performance will be judged." *Appellant's Appendix* at 51. Thus, it is clear to me that the trial court *did* consider the State's dissatisfaction in making its determination with respect to whether the material breach had occurred. Perhaps, the Majority's rejection of the trial court's judgment in this matter was not based upon the trial court's utter failure to consider the State's dissatisfaction, but instead based upon the weight accorded that factor in the trial court's analysis. Regardless, I believe the trial court did consider this factor, and weighed it appropriately under the balancing test it correctly employed.

90

The Majority concludes that the trial court committed "flat error" in "treating …

liquidated-damages payments as the State's exclusive remedy[.]" Slip op. at 34. I cannot

agree that the trial court regarded the liquidated-damages payments in this manner. Rather,

the trial court noted IBM's shortcoming with respect to the timeliness metrics and indeed

labeled it a "breach." *See Appellant's Appendix* at 49, Finding of Fact No. 105. The

question is, was this breach "material"? The trial court concluded it was not, based largely

upon the fact that, per the contract, the State was compensated for those breaches,

explaining:

> [T]hat was also the contemporaneous understanding of the State's OV&V
> contract compliance organization and lead outside. As First Data's Sanjay
> Vaze testified, 'if timeliness was not met in a given month but IBM paid the
> liquidated damage, then as far as [First Data was] concerned, that was
> technically not a contractual breach.' Similarly, as the State's James
> Maxwell acknowledged, 'IBM could perform under the contract by paying
> the contractual penalty if it was out of … spec on any of the performance
> measures.'

*Appellant's Appendix* at 50. I do not interpret this as indicating that the trial court viewed

the liquidated damages payments as the State's exclusive remedy for a breach of this sort.

Instead, the court found that, "*based on the complete record in this case …* the Coalition's

failures to meet certain Schedule 10 metrics did not constitute a breach of the MSA, in light

of IBM's payment of liquidated damages." *Id.* (emphasis supplied). In other words, the

trial court concluded that, in the context of the extensive and varied services IBM was

required to perform under the MSA, the extent and frequency of its failure to meet the

timeliness metric was simply not a *material* breach. I agree with that assessment.

This conclusion, in turn, requires me to address an issue presented upon cross-

appeal by IBM. The MSA contained a deferred fees provision that distributed payments

91

over a term of years for unamortized balances due to IBM. Labeled "service investment fees" by the parties, this constituted deferred compensation for work IBM and its subcontractors performed in the early stages of the project by spreading the cost over the life of the contract. This was done to address budgetary concerns that arose because at least two years of the modernization project were unaffordable, given the State's budgetary constraints. IBM sought these fees in the trial court. The trial court refused to award service investment fees based upon its conclusion that those deferred fees were designed to "prevent a future breach" and thus were not reasonably related to any harm suffered by IBM. *Appellant's Appendix* at 225. As a result, the court concluded that the service investment fees sought by IBM amounted to an unenforceable penalty.

To the contrary, the fees that were the subject of the service-investment-fees provision in the MSA had already been earned at the time of the lawsuit. The MSA provided that, in the event of termination, the State would pay the unamortized balance of the deferred fees to IBM. The MSA did not associate either the payment of deferred fees or the date those payments were due with a breach of the MSA. Thus, in my view, the trial court erred in declining to order the State to pay the deferred fees requested by IBM.

Similarly, the MSA specified that IBM was entitled to fees associated with the transition from the system in place before this contract was executed to the system IBM would put in place. As was the case with the service investment fees, these fees had already been earned at the time this dispute arose. Accordingly, I believe the trial court erred in declining to order the State to pay the transition fees.

In summary, I agree with the Majority that IBM was entitled to assignment fees and

92

equipment fees, as determined by the trial court. I agree that IBM was entitled to fees associated with Change Orders 119 and 133, but not entitled to fees associated with Change Orders 71 and 102. I also agree that IBM was not entitled to prejudgment interest. Upon my conclusion that IBM did not materially breach the contract, however, I believe IBM was entitled to transition fees and $20.8 million in service investment fees, and I would affirm the trial court's award of $2.6 million in early termination closeout payments. Accordingly, I would remand this cause to the trial court to determine the amount of transition fees and the fees associated with Change Orders 119 and 133.